**Susan K. MOFFETT (formerly Susan K. Partin), Plaintiff,**

v.

**GENE B. GLICK CO., INC., Defendant.**

**Civ. No. F 84–250.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Oct. 21, 1985.

248

Ernest M. Beal, Jr., John S. Knight, Parrish, Knight, Jackson & Beal, Fort Wayne, Ind., for plaintiff.

James F. Beatty, James W. Beatty, Virginia Dill McCarty, Landman & Beatty, Indianapolis, Ind., Richard J. Thonert, Fort Wayne, Ind., for defendant.

## MEMORANDUM OPINION AND JUDGMENT

WILLIAM C. LEE, District Judge.

This matter is before the court for a decision on the merits following a bench trial. This case deals with alleged violations of Title VII, 42 U.S.C. § 2000e-5, and 42 U.S.C. § 1981, as well as state causes of action, arising out of plaintiff's employment with, and eventual termination by, the defendant company. Trial lasted thirteen days, with the court hearing testimony

on March 18–21, April 17–19, May 6–8 and 20–21, 1985, and final arguments on August 19, 1985. The trial transcript is 2,423 pages long, and the court heard testimony from twenty-seven witnesses and received over 175 exhibits in evidence. The parties filed 384 pages of trial and supplemental trial briefs. The court has carefully reviewed this entire record. Having examined and considered this extensive record, having determined the credibility of the witnesses after viewing their demeanor and considering their interests, and being duly advised, the court hereby enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

The plaintiff, Susan K. Moffett, formerly known as Susan K. Partin ("Partin"), is an adult, white female who currently resides in Houston, Texas. The defendant, Gene B. Glick Company, Inc. ("Glick"), is an Indiana corporation with its principal place of business in Indiana. Glick's corporate headquarters are located in Indianapolis, Indiana.

Glick manages apartment complexes in fourteen states, including Indiana. It manages approximately 20,000 apartment units, and is heavily involved in federal subsidy and housing assistance programs. In the Fort Wayne, Indiana area, Glick manages six complexes, including Cambridge Square Phases I and II.

Glick had a specific managerial hierarchy for managing the apartment complexes. At each complex, a Rental Manager was primarily responsible for the operations of the complex. According to the Rental Manager's job description, "all community rental and maintenance personnel are under the supervision of the Rental Manager." However, that same job description made it clear that the maintenance staff was not exclusively controlled or supervised by the Rental Manager:

With regard to maintenance, the Regional Maintenance Supervisor [RMS] serves

in a staff capacity and assists the Rental Manager *by performing the hiring, training and supervisory function.* It is the Rental Manager's responsibility to ensure that the project is maintained to GGMC standards, *but not to become involved in the day to day scheduling of maintenance activities ...* If there is a problem and the project is not up to standards, *the Rental Manager is to request that the Maintenance Superintendent take specific corrective action ....* If appropriate action is not taken by the Maintenance Superintendent, then *she is to request the assistance of the RMS—and then the Regional Property Manager, as a last resort.*

Ex. F (emphasis added). The supervisory capacity of the Rental Manager over the maintenance staff was thus largely nominal. She supervised them to the extent that they were on the complex's grounds, but she did not hire, fire, train, or get involved in daily maintenance staff performance. When she had a problem with maintenance staff performance, she could not go directly to the staff; instead, she had to go to the Maintenance Superintendent, the Regional Superintendent or the Regional Property Manager. Thus, while Glick recognized the Rental Manager as the highest ranking employee at a complex, the maintenance staff was more independent of than subordinate to the Rental Manager.[1]

At each complex, a Rental Assistant helped the Rental Manager run the complex, although many Rental Assistants split their time at two complexes. In the managerial hierarchy, the Rental Assistant was below the Rental Manager.

Over the Rental Managers was the Regional Property Manager, who acted as immediate supervisor of several Rental Managers in a given region. At all times relevant to this case, the Regional Property Manager for Glick's Cambridge Square complexes was Becky Altmanshofer ("Altmanshofer"). Her immediate supervisor was Jack Kline, a Glick Division Manager.

On July 7, 1981, Partin was hired as a Rental Assistant at the Cambridge Square complex in Fort Wayne, Indiana. As part of the hiring process, she was given a battery of tests, and received an overall rating of "excellent" from Altmanshofer. At that time, the Rental Manager at Cambridge Square was Deb Smith.

In Fall, 1981, Joseph Mickilini ("Mickilini") began working at Cambridge Square as an Assistant Maintenance Superintendent. Partin and Mickilini became good friends, in part because Mickilini was dating Deb Collier, a groundsperson at Cambridge Square who had become Partin's closest friend. Partin, Mickilini and other members of the Cambridge Square staff socialized together frequently.

In the spring of 1982, Glick decided to split the Cambridge Square complex into two "phases," in effect making two complexes out of one. On June 2, 1982, Glick promoted Partin to the position of Rental

---

**1.** In response to a question by the court during final arguments, Glick's counsel attempted to offer proof that a Rental Manager had authority to discipline maintenance workers. They refer to a memo of February 18, 1982, in which Becky Altmanshofer, the Regional Property Manager, states that the Rental Manager "has responsibility for the total project, including the ... maintenance function." However, the memo also states that "[t]he [Rental Manager] will not interfere with maintenance functions unless it becomes necessary," that the Maintenance Superintendent is "[u]nder the direction of the [Regional Property Manager] and the [Rental Manager]" and that maintenance staff "will work directly with and report directly to [the Maintenance Superintendent]." This does not indicate that the Rental Manger enjoys disciplinary power; rather, it shows (as does the job description above) that the Rental Manager will be held responsible for the work of the maintenance staff despite limited control over the staff. In addition, counsel cited four disciplinary actions which they claimed were from a rental manager directly to a maintenance superintendent. Ex. CY; CX; DP; DS. However, all four were signed by Becky Altmanshofer, and the Rental Manager's signature was on only one (Ex. DP). These exhibits were actions taken by the Regional Property Manager, not the Rental Manager. They support, not rebut, Partin's contention that the Rental Manager did not have disciplinary authority over maintenance staff. The court therefore finds as a matter of fact that Partin did not have authority to discipline Hall and Mickilini.

Manager for Phase II, effective June 26, 1982. In November, 1982, Partin became the Rental Manager at Phase I, and stayed in that position until her termination in August, 1983.

In February, 1982, Harry Hall ("Hall"), a Maintenance Superintendent at Fairington, another Glick Complex in Fort Wayne, was transferred to Cambridge Square because of a sexual harassment charge filed against Glick.[2] When Cambridge Square split into two phases, Hall became the Maintenance Superintendent for Phase I, and remained in that position when Partin became the Rental Manager at Phase I. Prior to that managerial change, Hall and Partin had become acquainted because Partin was Rental Assistant at Phase I until June, 1982, and remained in the Phase I office even after becoming Rental Manager at Phase II because Glick had kept the Phase I and II rental offices together.

While Partin was still Rental Manager at Phase II, she met John Moffett ("Moffett"), a black male who, in April, 1982, became a resident at Phase II. During the summer of 1982, Moffett frequently visited the rental office at Cambridge Square, became casual friends with Partin and acquainted with other Cambridge Square employees, including Hall and Mickilini.

During Summer, 1982, Hall and Mickilini began calling Moffett "Black Bart" in conversations with other Glick employees.[3]

The practice increased in frequency, and by Fall, 1982, Hall and Mickilini even called Moffett "Black Bart" to his face. Partin requested that use of the term be stopped because she believed that it hurt Moffett to hear it, but neither Hall nor Mickilini stopped.

In October, 1982, Partin began dating Moffett casually, and in November, 1982, the relationship became more serious. Mickilini, who learned of the relationship through Deb Collier and through Moffett's presence at Partin's house when Mickilini would visit, was displeased with the relationship. In October, 1982, after observing Partin and Moffett leaving the rental office at the end of the day, Mickilini motioned Partin over to the maintenance garage and asked whether Moffett was trying to get Partin to go out with him. Upon learning that Moffett was, Mickilini became upset and said, "Hey, if you go out with that goddamn nigger, I'm going to kick your ass ... You should have learned from the last one," referring to a previous relationship Partin had with a black man.

In November, 1982, a second incident occurred. Mickilini had been storing his motorcycle in the maintenance garage, but was asked to remove it. He therefore asked Partin if he could store the motorcycle in her garage. Partin agreed, provided that Mickilini cleaned out the garage and promised to have the motorcycle removed

---

**2.** The charge was formally filed with the E.E.O.C. in May, 1982 by Deborah Barfell, a maintenance employee under Hall's supervision at Fairington. According to the charge, Hall made sexual jokes, derogatory remarks and propositions to Ms. Barfell, ultimately forcing her to resign in January, 1982. Although Hall was transferred to Cambridge Square in February (three months before Barfell actually filed the charge), the reason for the transfer was Hall's harassment of Barfell.

**3.** The court here details several credibility determinations which underlie these factual findings. The court found the testimony of Harry Hall, Joseph Mickilini and Mario Talementez unworthy of belief, and expressly discredits their testimony. Based upon its observation of Hall and Mickilini's demeanor in the courtroom, the court found Hall and Mickilini to be among the least credible witnesses it has ever observed in a

courtroom. The court found the plaintiff believable, and credits her testimony generally.

At final argument, counsel for defendant Glick attempted to discredit the plaintiff by pointing to testimony by defense witnesses, the memos of Becky Altmanshofer, and alleged conflicts or inconsistencies in plaintiff's testimony. However, the vast majority of defense witnesses were not present for much of what occurred between plaintiff and Hall and Mickilini, and given the credibility determinations above, the court finds plaintiff's version of the facts believable. Altmanshofer's memos, drawn up by someone not involved in the day to day activities of the complex where plaintiff worked, are limited sources of fact, while the alleged conflicts in plaintiff's testimony appear to be more in the nature of hyperbole than inconsistencies. Where appropriate, the court will discuss the disputes underlying these factual findings.

from the garage by the first snowfall, when Partin would need to start keeping her car in it so that it would start in the morning. Mickilini agreed, and stored the bike there for a period of time. Partin eventually asked Mickilini to remove the bike. Mickilini asked about who would be using the garage. Upon finding out that Moffett had asked Partin if he could keep his Trans-Am in the garage, Mickilini said that "there is no way I'm going to come get the bike and move it out for any goddamn nigger's Trans-Am."

Racially and sexually oriented comments at the Phase I rental office became commonplace in November-December, 1982. Mickilini and Hall referred to Partin as a "nigger lover," "stupid cunt," "whore," and "dirty bitch" on a regular, daily basis. They warned her that one day she was going to wake up and be black, and that no good white man would ever want her after he knew that she had slept with a black man.

█ Despite Partin's entreaties, the comments did not stop. In fact, Hall and Mickilini began to threaten Partin that they would tell Altmanshofer about Partin's dating a black man, which they said would get Partin fired. Partin decided to bring the situation to Altmanshofer's attention. At a dinner in early December, 1982, with Moffett, Altmanshofer and herself present, Partin informed Altmanshofer of the situation developing at work and of Hall's and Mickilini's use of terms such as "nigger" and "nigger lover."[4] Feeling that she should and could stop the harassment on her own, Partin did not at that time ask Altmanshofer for assistance; rather, she asked for advice on what should be done. Altmanshofer advised Partin that she would speak to Hall and Mickilini and that she would get it stopped.

Up to this point in time, Partin had received generally favorable ratings for her work. On May 17, 1982, Partin was given a Rental Manager/Rental Assistant Evaluation, and received a rating of 85 on a 100-point scale, which is in the middle of the "good" range. Her strengths listed in the evaluation were that she "works hard most of the time" and that she's "very personable and outgoing." Her weaknesses included "encourag[ing] unprofessionality by letting maintenance staff sit in rental office" and that "paperwork [was] not getting done quickly." These weaknesses did not stand in the way of Partin's promotion to Rental Manager of Phase I in June, 1982. Altmanshofer and Gene B. Glick, president of Glick, both wrote Partin letters praising her dedication and enthusiasm. On October 27, 1982, Partin received a score of 89 on a subsequent evaluation by Altmanshofer, who gave her the highest possible number of points for "professionalism," but again criticized Partin's paperwork. On November 3, 1982, Partin was placed on probation for thirty days for her paperwork problems. The problems cleared up, and the probation was ultimately lifted without further incidents.

By mid-December, 1982, the situation at the Phase I office had not changed despite the early December dinner discussion between Partin and Altmanshofer. Hall and Mickilini continued to use the racially and sexually derogatory language they had used before despite Partin's request that they stop. A day or two before the Glick Christmas party on December 14, 1982, Hall and Mickilini threatened to damage Moffett's car, which Partin had begun driving to the office. They specifically threatened to remove the spoiler from the back of the car. Upon leaving the Christmas party, Partin found that the spoiler had been removed from the car. She went back inside and told Altmanshofer of the threat

---

**4.** This is the first of several instances where the testimony of Altmanshofer and Partin conflict. Based upon the court's observation of these witnesses' demeanor in the courtroom, the court determines that Partin is more likely to be telling the truth. Incidents such as the biased trial exhibit described later in these findings of fact reinforce this conclusion. Thus, in those specific instances where Altmanshofer's testimony directly conflicts with Partin's, the court credits Partin's testimony.

and the missing spoiler.[5] Altmanshofer responded by telling Partin not to drive the car to work so that Hall and Mickilini could not damage it, and that if Partin was going to pursue dating Moffett, she would have to get used to comments and things like that.[6]

Just prior to Christmas, 1982, Moffett came into the Phase I rental office to pick up Partin at the end of the day. Hall and Mickilini came into the office, and began making racial comments to each other in the presence of Moffett, including "it would be a damn good day to hoist a nigger up a flagpole," that "niggers ought to be shot like the other one was," referring to Vernon Jordan, the black civil rights leader who had been shot in Fort Wayne, and "they ought to figure out some way so they'd quit breeding like that." One of the two suggested that they go down to the local K–Mart and harass Jesse Jackson and other blacks who were picketing there on behalf of Operation Breadbasket. Partin made no comment at the time, but the next day attempted to sit down with Hall, Mickilini and Moffett during lunch to try and reach a peaceful solution. The impromptu meeting ended in shouting and in Hall and Mickilini telling Partin and Moffett that they would do whatever they felt like doing.

Also just before Christmas, 1982, Partin informed Hall and Mickilini that she and Moffett were going to Atlanta, Georgia for Christmas. Mickilini told Partin that she and Moffett were "fools" to go because they might get "shot in the head" for being an interracial couple.

By this time, the harassment and abuse began to take its toll on Partin. She had long suffered from an unidentified palsy condition which was being controlled by medication. The condition meant that Partin was susceptible to palsy attacks if subjected to too much stress. By Christmas, 1982, the palsy had begun to act up. Partin felt like "a nervous wreck," suffering from loss of appetite and sleeping problems. She did not wish to return to work after her Atlanta vacation, but testified that she did return because of her two teenage children who lived with her.

In early January, 1983, the situation at work improved slightly because Partin and Moffett had temporarily broken up. However, at the end of the second week of the month, Mickilini came into the rental office and asked Partin if she and Moffett were getting back together again. Partin told him that she and Moffett were "working on it," and Mickilini replied, "Jesus Christ, you never learn. What does that fucking nigger have that you can't get away from him?" He warned Partin: "I'm telling you right now if you don't get rid of that nigger, none of the staff is even going to speak to you."

In late January, 1983, a meeting was held with Hall, Mickilini, Moffett and Partin present. However, as with the meeting held prior to Christmas, 1982, no end to the harassment resulted.

On February 1, 1983, Altmanshofer came to Phase I and met with Partin. She learned of the racial comments being made by Hall and Mickilini, and that the situation was getting worse. Instead of proposing any concrete method for dealing with the harassment, Altmanshofer asked Partin what she thought should be done. Partin suggested a meeting between all of the parties involved.

---

5. As it turned out, the spoiler had in fact been removed by Moffett while Partin attended the party.

6. This remark, which evidences toleration of Hall and Mickilini's harassment in and of itself, also serves to undermine defendant's version of the facts as based on Altmanshofer's memos. Glick has painted Altmanshofer as a person who wrote memos and recorded events and reports she received, so that the fact that certain events were not reported in her memos indicates that they did not occur. The court finds that Altmanshofer's own racial bias, evidenced in this comment and in her later treatment of Partin after the first charge was filed, is the more probable reason why certain events were not recorded—racially derogatory comments are not very important (and thus complaints about them are not important) because they are to be expected by someone in an interracial relationship.

The meeting was held that same day in the community room of the Phase I rental office. Partin, Moffett, Hall, Mickilini and Altmanshofer attended. Partin discussed the racial comments, including the "flagpole" incident, the references to the picketers at K–Mart, as well as the sexual comments and names directed at Partin personally. She requested that Hall and Mickilini treat her like a human being and respect her as a manager, even though they did not have to respect her as a person. She warned Altmanshofer that the harassment was affecting her job and that it would eventually spill over to the residents because it was so bad.

Altmanshofer promised that Hall and Mickilini would be reprimanded, or "written up," but no such reprimand or disciplinary action ensued. Instead, the next day she issued an interoffice memorandum to Partin, Hall and Mickilini on the subject of "professionalism." The memorandum set forth three rules for staff relations at Phase I: (1) all personal business will be kept as personal—all personal discussions or relationships were to be discussed on one's own time, not in the business office; (2) "No staff member will indulge in gossip or derogatory remarks of any sort to either a staff member or a visitor to the rental office"; and (3) all staff members will treat each other with respect and courtesy at all times. The memo then admonished:

> I would like to stress that I feel the entire situation has been handled by all parties involved with *unprofessionalism*. I trust the meeting held on Tuesday will continue the increase in *professionalism* that has appeared during the past month and feel certain that working together you can all remain a good working team. All of you keep in mind that *professionalism* breeds *professionalism*. If you treat others around you as a *professional* and maintain your job on a strictly *professional* basis you will be treated *professionally*.

The only other actions taken by Altmanshofer in response to the February 1, 1983 meeting was to ban Moffett from the rental office, believing that if Moffett was not present to see what Hall and Mickilini did, then he would not get upset about their actions. In addition, Altmanshofer informed her supervisor, Jack Kline, of the problems at Phase I in a memo she wrote to him shortly after the February 1, 1983 meeting.

On February 2, 1983, the day after the meeting, Partin found an intercom hidden behind a plastic plant on the counter in the kitchen of the rental office. The intercom was locked in the "on" position, and a wire attached to it led out into the maintenance garage. The kitchen had been a place where Partin and Moffett would talk when Moffett came into the rental office. Partin confronted Hall about the intercom, and he told her that he had brought it from home. He informed her that "we were just messing around with it," referring to himself and Mario Talementez, a groundsperson at Phase I. He admitted that the other receiver was located on his desk in the maintenance garage. Partin ordered it removed, and Hall removed it.

On February 23, 1983, Mickilini came into the Phase I rental office and demanded that his girlfriend, who was living at Phase I, be put on rent supplement.[7] Partin explained that Mickilini's girlfriend was on a waiting list for rent supplement, and had to wait until someone moved out and a spot opened up on the rental supplement list. Mickilini yelled at Partin, calling her a "fucking bitch," charging that she was doing this only because it was Mickilini's girlfriend, and saying that he wasn't going to leave until Partin put his girlfriend on the list. Partin became upset, refused to do it, and told Mickilini that he was banned from the rental office and should leave. Mickilini refused, but left after Betty Penrose, Partin's Rental Assistant, threatened to call the Indianapolis office. Partin went to

---

**7.** As noted before, Glick was involved in several federal housing assistance programs. One such program was rent supplement, whereby federal funds were used to pay a part of a qualified resident's rent.

Hall, who as Mickilini's superior was responsible for disciplining him, and told Hall of Mickilini's conduct. She raised her voice and got very emotional. Hall called Altmanshofer, who met with Partin, Hall and Mickilini on February 23, 1983.

The end product of the February 23, 1983 meeting was two memos. The first was written to Partin on the subject of "professionality." The first two paragraphs castigated Partin:

> While understanding that you were upset when Joe instigated an incident in the rental office on 2/22, you violated professional ethics by getting emotional in discussing the situation with Harry. Sue, there is no way in the world that you will get persons around you to act professionally if you don't. You set an image to your staff and by allowing yourself to get involved and/or upset instead of acting in a professional manner, you are indicating to your staff that they may also perform in an unprofessional manner.

> I will no longer in memo form try to suggest how to be professional. I will advise upon request, but you have taught me that no one can teach you to be professional if you don't have the desire. We have discussed this before in dealing with your residents as well as staff and I want to again note that I expect you to act in a professional, quiet and efficient manner during your tenure as a Glick employee. Any conversations or consultations to other staff members

should be in writing and when discussed, the memo should be strictly adhered to. The second memo indicated that Altmanshofer told Mickilini at the meeting that "if any further incident whatsoever occurred again, he would be fired."

Altmanshofer's directive that all communications should be in writing did not work. When Partin gave memos to Hall or Mickilini, they disregarded them, telling Partin to "shove them up her ass" or go do the work herself. When Partin complained that the memo system was not working, Altmanshofer said she was tired of hearing complaints and that if Partin did not shut up and quit bringing them up, then everyone including Partin would be fired.

As the situation in the rental office deteriorated, Partin's situation at home did as well. Moffett struck Partin and had several arguments specifically because of the situation at Phase I. Moffett first struck Partin in Atlanta, Georgia on the Christmas, 1982 trip. The arguments continued throughout early 1983, as Moffett was upset at Partin's failure to fire Hall and Mickilini despite her lack of authority to do so. The worst incident of domestic violence occurred on March 26, 1983, when Moffett beat Partin, bruising her face and arms, and bursting her right eardrum. Partin had criminal charges filed against Moffett, but later dropped them.

Partin used vulgar language at the Phase I office occasionally. When she was angry at Moffett, she would call him names such as "asshole", "son of a bitch", or "bastard", but never used racially derogatory terms in public or at the rental office.[8]

---

8. At final argument, Glick's counsel attempted to attack Partin's statement that she never used racially derogatory names for Moffett by pointing to the testimony of six witnesses: Hall, Mickilini, Talementez, Deb Collier, Betty Keelan, and Kym Guevara. The court discredits the testimony of Hall, Mickilini and Talementez. Deb Collier testified to conversations at the rental office in which Partin used racial terms (T.R. 2201–2203), and yet admitted on examination by the court that she stopped going over to Partin's house after Christmas, 1982 (T.R. 2229), that when she went to the rental office, Moffett would be there so that she would not talk to Partin about personal matters (T.R. 2231), but that they talked on the phone (T.R. 2231–2232).

Those admissions totally undermine her testimony, and the court discredits it. Betty Keelan testified that Partin used terms like "son of a bitch", "fucker" and "black bastard" (T.R. 1449) in one conversation after Moffett had beaten her. Kym Guevara testified only to Partin's use of "shit", "fuck", "damn", and "the hell with it" (T.R. 1523). Thus, the only credible testimony of Partin using a racially vulgar term is Betty Keelan's reference to "black bastard", which came almost as an afterthought in responding to a request of counsel to speak louder. Given the court's assessment of the credibility of the witnesses, the court accepts Partin's testimony as true.

Partin also engaged in conversations with Glick employees about her personal relationship with Moffett, but Hall and Mickilini's harassment was not a result of, or a reaction to, these conversations.

The court finds that Hall and Mickilini did not keep their general animosity towards blacks nor their racially-based animosity towards Partin within the confines of the rental office. Rita Hamrick, a resident at Phase I, testified about an incident at her apartment involving Hall. While Hall was making repairs on Hamrick's plumbing, she told him that Partin had asked her to go out for a drink sometime. Hall told Hamrick that she had better taste than that, discouraging Hamrick's going out with Partin because Partin liked "niggers." He told Hamrick that Partin was seeing a "black buck nigger named John," and that although Partin was his boss, he was not going to listen to her because she was seeing John.

Marshall Littrell testified about an incident outside the rental office. While Partin was going out to her car, one of the maintenance staff members who was out raking the yard held up the black-handled rake and said, "I've got your black jack, baby," which Littrell took to refer to the "private parts" of a black man. Partin testified that she heard the comment.

Osama Abdulrahim, a groundsperson who working during the summer and early Fall of 1982, testified that Mickilini told him that "Sue only goes out with niggers." In addition, Abdulrahim indicated that Hall and Mickilini referred to him as "camel jockey" because of his Syrian ancestry, and called Mario Talementez, a Hispanic, "pinto bean" and "taco." He also described an incident when a black man applied for a maintenance position, but Hall told Abdulrahim that he was not "hiring any niggers."

The situation at work continued to be bad for Partin. Relations between Partin and the staff were strained, and worsened from the February 1, 1983 meeting on. Altmanshofer refused to listen to Partin's attempts to explain what was going on.

On May 12, 1983, when Altmanshofer was at Phase I, Partin took her aside and told her that she (Partin) gave up—that she could not take it any more, and that she was abused and isolated to the point that she could not even do her job. Partin offered to resign or transfer. Altmanshofer instead typed up a memo which she gave Partin, Kym Guevara, the Rental Assistant, Talementez, Hall, Mickilini, and Mark Garr, a temporary groundsperson, to sign. That memo read in pertinent part:

It has been brought to my attention that some staff members are continuing to indulge in and make derogatory and discriminatory remarks during office hours and within the project. I wish to reaffirm the company policy, my policy, and the policy our region and all staff members will adhere to in regard to discrimination. You have all signed the non-discrimination and employee policy agreement which is a matter of personnel record. Be advised that non-adherence to this agreement will result in termination.

\* \* \* \* \* \*

From this date forth, the Rental Manager, Sue Partin, will have full authority on her project, including the authority to hire and fire individuals. Should *any* employee make any derogatory or discriminatory remarks, innuendos or comments regarding residents, employees or others, they will be terminated immediately.

There will be no deviation from this procedure. We will not tolerate an employee who discriminates against anyone, or discrimination in any form.

There will be no further warnings—you will simply be terminated. Your Rental Manager has the full responsibility and authority to implement and comply with the foregoing procedure.

In effect, Altmanshofer abdicated her responsibility to hire and fire employees and gave it to Partin. However, Partin's authority was shortlived. Within a few days after the May 12, 1983 memo, Altmanshofer told Partin that no employee should be

fired without first checking with her, in effect limiting Partin's "full authority" to hire and fire by requiring Altmanshofer's approval.[9]

The effectiveness of the May 12, 1983 memo was apparently questionable even in Altmanshofer's mind. In a memo to Jack Kline and James Beatty, corporate counsel for Glick, dated May 13, 1983, Altmanshofer stated:

> I am at loss at this point. Yesterday I gave her full authority to fire any and all personnel indulging in any type of discriminatory remarks ... and told her that the ball was in her court and that I expect her to carry through if an incident should occur. I also told the maintenance staff that if they were not prepared to work within these guidelines they had better look for a job elsewhere. *Sue feels very strongly that since she is still dating John (her fiancee), the problems will continue.*

(Emphasis supplied).

Jack Kline's response to the May 13, 1983 memo set forth the apparent attitude of Glick's management toward the Partin situation:

> Becky, I'm afraid if Sue is entering into this relationship she had better be prepared to get snide remarks from just about anyone and everyone. I don't think inter-marriages are accepted in our society today and although you and I certainly would not say anything, I am not sure we can keep our staff from

saying things. I am not sure that we could fire them on the basis of their remarks. You had better check with Jim Beatty and see if he agrees with what I am saying.[10]

By this time, the situation at work physically and emotionally affected Partin. She was unable to sleep. She was physically ill, and the palsy condition acted up because of the added stress, giving her palsy attacks. She hated going to work, and felt that she was having a nervous breakdown. The stress caused by the harassment and the general situation at the rental office adversely affected Partin's work performance. On May 20, 1983, Partin chose what she viewed as the only alternative to quitting: she filed a harassment charge with the Fort Wayne Metropolitan Human Relations Commission.

The filing of the charge did not improve the situation at Phase I; if anything, it made it worse. Partin began to get the "silent treatment" from the staff—only Kym Guevara, the Rental Assistant, spoke with her. This silent treatment adversely affected Partin's job performance. For example, two incidents involving residents occurred, but because Partin was not told about them, she failed to file "incident accident" reports within the prescribed 24-hour period. Partin found out about the incidents only after the residents involved called her to ask why nothing had been done. Hall and Mickilini confronted Partin

---

9. The real impact of this requirement of Altmanshofer's approval can be seen in a memo Altmanshofer wrote to James Beatty on May 26, 1983, concerning the discrimination charge Partin had by that time filed. In the memo, Altmanshofer stated:

> I must state again I HAVE NEVER PERSONALLY HEARD OR SEEN EVIDENCE THAT SHE OR JOHN WAS BEING DISCRIMINATED AGAINST, and did not feel that I could fire someone based on her allegations. I have, in fact, given her support when I felt she was wrong, simply because she was the rental manager and needed my support. I do feel that Sue has major personal problems and has let her uncertainty about her relationship with John affect her rational thinking ... I have not had any indication from any per-

son working there that there was discrimination.

The clear import of this language is that Altmanshofer did not believe Partin (in fact, believed Partin was *not* completely rational) and would not fire someone on the basis of Partin's allegations. Thus, by requiring Altmanshofer's approval, Partin's authority to fire lost all force, as it is doubtful that Altmanshofer would have approved of a recommendation to fire any Phase I employee.

10. After checking with Beatty, Altmanshofer responded to Kline's memo with a memo of her own on May 17, 1983. In that memo, Altmanshofer relayed Beatty's opinion that employees could not be fired for making discriminatory remarks, but could be fired for being "unprofessional" and for lack of respect for the manager.

about the charge in late May, 1983, with Mickilini yelling "what the fuck do you think you're doing, bitch?", and telling Partin that it was a bad mistake, filed only because Moffett forced her to do it. Hall told Partin that if he thought it would knock some sense into her, he would bang her head against the wall. Altmanshofer brought up the charge in early June, 1983, saying that she was hurt because she was named in the charge, and asked Partin to consider dropping the charge. When Partin refused, Altmanshofer said, "I guess we both have to do what we have to do."

By June, 1983, Altmanshofer had already decided that Partin had no future with Glick. It was Altmanshofer's policy and practice to "salvage" employees whenever possible, applying selective disciplinary alternatives to correct performance deficiencies and avoid terminating the employee. One of the alternatives used by Altmanshofer in the past was transfer to a different complex, and had been used to correct problems of Hall and Kym Guevara. On May 25, 1985, the Rental Manager at Fairington, Marilyn Abel, told Altmanshofer that she would be willing to trade places with Partin. Altmanshofer rejected the idea:

> The rental manager at Fairington Apartments suggested to me on May 25th that she and Sue trade rental offices. Marilyn felt that if there were problems, and of Sue's making, that they would follow her. At first, I thought it might be worth trying; however since hearing that Sue had spoken with residents in regards to her alleged discrimination, I don't want these problems to be spread to Fairington. Sue told her rental assistant on the morning of the 25th that she felt justice would be done if Harry, Joe and myself were fired. At this time I think a transfer could cause more problems than it would solve.

By May 30, 1983, Altmanshofer had decided that Partin was "unsalvageable," and had decided against a transfer precisely because of Partin's allegations of discrimination. Instead, Altmanshofer began to develop evidence to use as grounds for firing Partin.

In June, 1983, Partin continued to be isolated by the staff. On June 23, 1983, Mickilini was transferred to another complex upon request by Partin's attorney, in part to keep him away from Partin. On June 30, 1983, Partin went on vacation to California with Moffett, and on July 4, 1983, they were married. When Partin left, Kym Guevara replaced Partin as Rental Manager, and Mary Dafforn substituted as Rental Assistant. Partin had left specific instructions with Guevara concerning work to be done during Partin's absence, but these instructions were not followed and much of the work was not completed. Dafforn testified that she cleaned off Partin's desk. In the process, she or Guevara removed items from the desk drawers, which were later anonymously returned to Partin. In particular, Partin returned to find the envelope containing copies of the charge she filed on her desk with the notation, "Becky, do you need this also. Mary" and "No. Becky" written on the outside of the envelope.

On July 22, 1983, the Fort Wayne Metropolitan Human Relations Commission issued a finding of probable cause on Partin's harassment charge, and on August 2, 1983, issued a proposed Conciliation Agreement. Both of these actions were sent to Glick in the mail.

On August 15, 1983, Partin was terminated. Altmanshofer delivered a termination letter to Partin dated August 9, 1983, which outlined the deficiencies in Partin's performance that resulted in her termination. The letter listed six basic areas of deficiency: failure to submit three office bills to accounting; late submission of seven recertifications and errors in recertification procedures; accounting errors and errors found in files; failure to answer eleven complaint or inquiry letters; failure to refile certain forms in resident files; and untimely submission of eight reports. While all parts of the termination were discussed at trial, the only deficiencies which received significant emphasis during

trial were the late recertifications, the accounting errors, the untimely submission of reports, and failure to refile documents in resident files.

Recertification is an important part of Glick's paperwork system because it is required for federal housing subsidy programs. On every twelve month anniversary of a tenant's residency, Glick must recertify to the government the tenant's status, including current salary. The information gathered from the process is used to compute what the tenant's rent will be for the coming year. The process begins by sending a letter to the tenant about ninety days before the recertification is due. The information received from the tenant is then verified. Errors in the recertification process can result in over- or under-charging the tenant, thus requiring Glick to refund money. The Rental Manager is responsible for making sure that recertifications are done properly and promptly.

In May, 1983, Partin was falling behind on her "recerts", submitting two recerts late. In June, Altmanshofer verbally told Partin and Guevara that Guevara was to only do the recertification work for Phase I, and this order was reaffirmed in a memo of late July, 1983. It was Guevara, not Partin, who was late on the recertifications, although by virtue of the managerial hierarchy, Partin was nominally responsible for them.

In addition, the recertifications could not have been a competent reason for firing Partin. According to the termination letter, Partin had seven late recerts and two other tenants had complained about not being recertified. Altmanshofer ultimately testified that Partin had eleven late recertifications. Comparison with other Rental Managers in the Glick operation reveals that Partin did not have the worst recertification record, even though she was the only one fired. For example, the Rental Manager at Carriage House West, Phase I in Indianapolis had nine late recertifications in 1983, and eleven in 1984. At Carriage House West, Phase III, also in Indianapolis, the Rental Manager had eight in 1983 and ten in 1984.[11] The failure to fire other Rental Managers with far worse performance records suggests a motive other than dissatisfaction with Partin's recertifications was behind the firing.[12]

The second area of deficiency was Partin's accounting errors. According to the termination letter, Partin had a total of twenty errors. In addition the letter referred to several audits of Partin's files where errors were found. According to an exhibit prepared by Altmanshofer for testimony, during the period from June 22, 1983 to August 9, 1983, Partin received nine memos from accounting detailing seventeen errors. Again, this was not the worst performance record amongst Altmanshofer's Rental Managers. According to that same exhibit, Marilyn Abel, the Manager at Fairington in Fort Wayne, received seven memos detailing twenty accounting errors from February 7, 1983 to October 3, 1983. The pretextual nature of this reason for Partin's termination became especially apparent when Altmanshofer testified that Marilyn Abel is the Rental Manager who took over at Phase I when Partin was fired. In addition Kym Guevara, who had been responsible for the late recertifications, was also promoted after Partin's termi-

---

**11.** Neither of these complexes is located in Altmanshofer's region, and thus Altmanshofer could not have fired these Rental Managers. However, the testimony at trial indicated that management personnel above Altmanshofer—such as Jack Kline—were involved in the decision to terminate Partin. Their approval of Partin's termination and failure to terminate these other Rental Managers suggests a motive that looks at something other than recertification performance.

**12.** The other recertification problems listed in the termination letter involved Partin's ten and seven day delays in mailing recertification letters written by Guevara, and the failure to have stamps for the Rental Assistant to send recertification letters. No testimony was offered by the defendant to indicate that these delays caused any real problem for Glick other than the fact that Glick policy required that they be sent right away. Trial testimony focused primarily on the late recertifications; the court therefore concludes that these transgressions were not significant factors in the decision to terminate.

nation despite the fact that she had a history of paperwork problems.[13]

The third major deficiency discussed at trial was Partin's untimely submission of company reports. Each Rental Manager is required to submit certain company reports on time. These reports include weekly or bi-weekly Rental Turnover, Traffic and Rental Manager Inspection Reports, as well as monthly inspection and vacant unit reports. The termination letter listed eight tardy reports; examination of the report control logs for the period December, 1982 —July, 1983 reveals that Partin submitted seven late Rental Turnover reports, seven late Traffic reports, and one Rental Manager inspection report. During this same time period, Marilyn Abel, the Fairington Manager who would replace Partin at Phase I, had nine late Rental Turnover reports and ten late Traffic reports. The Rental Manager at Cambridge Square in Muncie submitted seven Rental Turnover and seven Traffic reports late. The Manager at Carriage House in Muncie submitted ten Rental Turnover and four Traffic reports late. All three of these Managers were under Altmanshofer's supervision, but only Partin was fired.[14]

■ The remaining deficiencies listed in the termination letter do not by themselves offer significant grounds for firing Par-

tin.[15] The evidence in this case has indicated that Partin was not a perfect or model Glick employee, yet the evidence also indicates that her job performance did not begin to show serious deterioration until late Spring and early Summer, 1983, when the harassment and the domestic violence caused by the harassment peaked. An examination of the incidents cited in the termination letter indicates that, with the exception of some of the audit errors and one unanswered tenant complaint letter, every incident occurred after April 1, 1983, and most of them occurred in June and July, 1983. Karen Wagner, a Program Director at the Working Women's Institute and an expert on sexual harassment on the job, testified that women subject to sexual harassment will have increases in work performance problems, including increases in on the job errors, as a direct result of harassment on the job. She also testified that this conclusion, based upon her personal counselling experience and on studies conducted by experts in the field of harassment, is applicable by analogy to discrimination based upon race.[16] In response to a hypothetical question based on the undisputed facts in this case, Wagner opined that a female in Partin's position would have her capacity to perform satisfactorily on the job adversely affected by the harassment and the response of manage-

13. Prior to working at Phase I as a Rental Assistant, Guevera had been a Rental Manager at another Glick complex, but was demoted to Rental Assistant because of paperwork problems.

14. After Partin's termination, Abel and Guevara continued to have problems with late reports. According to Glick's report control logs for the period September, 1983—April, 1984, Abel, as Rental Manager at Phase I had twelve late Rental Turnover, twelve late Traffic, and four late inspection reports. Guevara, as Manager at Fairington, had seven late Rental Turnover, seven late Traffic, and one late inspection report, the exact same number as Partin did. Neither Abel nor Guevara were terminated or received any memo from Altmanshofer on the matter.

15. One of the three grounds—the failure to refile confidential documents in tenant files—was considered somewhat important by Altmanshofer and received significant attention at trial.

On June 27, 1983, Partin had taken several tenant files to Indianapolis because she and Altmanshofer were going to redo certain forms because of a rent increase. Partin went on vacation on June 30, 1983, and on July 12, 1983, Altmanshofer allegedly found the files in a box in a back room of the office, and was "furious" and testified that she would have fired Partin on the spot for "gross negligence." Obviously, Altmanshofer's fury subsided quickly, as she did not fire Partin until nearly a month later, and almost three weeks after Partin returned from vacation.

16. Wagner testified that a leading analysis of the concept of "generalized" sexual harassment—harassment that takes the form of comments and derogatory terms, as opposed to "exploitive" harassment, which involves behavior to coerce or intimidate—is in fact derived from the history of harassment on the basis of race. See, Ellis, Sexual Harassment and Race, 8 J.Legis. 30 (1981).

ment that Partin suffered through. Defendant's own expert witness, Dr. Eugene Levitt, agreed on cross-examination that a person suffering job harassment would ultimately show some decline in job performance. The court finds that Partin's performance deficiencies are a direct result of Hall's and Mickilini's harassment, and of Glick's failure to stop that harassment.[17]

While the reasons proferred in the termination letter themselves indicate that Glick had no legitimate reason to fire Partin, other facts indicate that the rationale and manner of termination was based upon the fact that Partin had filed a discrimination charge against Glick. In effect at the time of Partin's termination was a Glick policy entitled "Documenting Unsatisfactory Performance." This policy states:

1. It is important that the RPM [Regional Property Manager] advise project personnel of any dissatisfaction with their performance. The primary purpose is to effect improvement. Secondarily, he must go "on record" of his dissatisfaction and has requested the specific improvement. This is a necessary step prior to termination of employment.

2. There should be a maximum of three notices:

a. Initial Notice (written immediately after the supervisor observes unsatisfactory performance): indicate specific reasons.

b. Follow-up Notice (written maximum of 30 days after initial notice): Indicate whether or not his performance is still considered unsatisfactory. If so, notice that if it remains so, he will receive notice of termination.

c. Notice of Termination (written maximum of 30 days after follow-up notice): Reiterate the reasons performance was considered unsatisfactory, refer to notices, and state termination date.

Partin received no Follow-up Notice, nor any kind or warning that she would be fired unless her performance improved, despite the fact that this policy of documenting deficiencies states that "going on the record" is a "necessary step prior to termination of employment." Altmanshofer testified that almost all the other employees she has fired received a final warning, in the form of probation or a final notice memo, before they were terminated, except for two cases which involved theft or possible theft. The reason why Partin received no final warning was that Glick's lawyers had advised Altmanshofer to restrict her communications with Partin, and Altmanshofer agreed that Partin was treated differently than she would have been treated had there been no charge pending.

Secondly, there is significant evidence to suggest that Glick, through Altmanshofer, set out on a course to "build up a case" against Partin once the discrimination charge was filed. As noted earlier, Altmanshofer had decided by May 30, 1983 that Partin was "unsalvageable," so that further mistakes or transgressions would not result in probation or other disciplinary alternatives, but only in dismissal. Carol Rice, a clerk in Glick's accounting office, testified that Altmanshofer asked her in May to send memos regarding accounting errors to the Rental Managers with copies to Altmanshofer, though Rice had usually discussed 95% of corrections over the phone with the Rental Managers. Thus, every error of Partin would come to Altmanshofer's attention. Rice also testified that Altmanshofer was usually "defensive" about errors made by her Rental Managers, but did not defend Partin after the discrimination charge was filed.

Perhaps the most revealing evidence of this motive is the exhibit prepared by Altmanshofer for use at trial. The exhibit is a summary of performance deficiencies for employees in Altmanshofer's region. It lists memos in the personnel files which contain matters which are critical of the employee's performance, as well as memos

---

**17.** The court credits Wagner's testimony and finds that she was qualified to testify as to sexual and racial harassment. Glick's feeble attempts to discredit her expertise fail completely, and its hypothetical question on cross-examination does not alter this court's conclusion that Partin's work performance suffered as a direct result of the harassment.

from accounting detailing accounting errors. For each of the Rental Managers, Altmanshofer sets out each memo, assigning a number to each. At trial, she counted up the entries for Partin and compared them to those for other Rental Managers, concluding that Partin, who had nineteen items listed, was the worst Rental Manager in her region.

The exhibit, however, is rigged. For example, one entry for Partin details a conversation Altmanshofer had with Partin on February 22, 1983 regarding paperwork. The next item listed is the February 23, 1983 memo on "professionalism", which included a paragraph on Partin's paperwork. In short, the previous entry concerning the conversation was superfluous, but does have the effect of making the total number of items larger. No other Rental Manager has any conversations with Altmanshofer listed amongst her items. Likewise, a later entry refers to a phone call from accounting concerning final settlement letters. No other Rental Manager has any phone calls from accounting listed amongst their items, despite the fact that Carol Rice testified that 95% of her corrections are done via the phone. Other items which were only listed in Partin's list of items included the letter of her promotion to Rental Manager on April 22, 1982, and two of her evaluations (May 20, 1982 and October 27, 1982). No other Rental Manager had such items listed for them. Finally, Altmanshofer admitted on cross-examination that the list was not complete as to some of the other Managers. She testified that she forgot to add in a memo from accounting concerning Kym Guevara, thereby altering the totals for an entry concerning accounting errors. In fact, she admitted that the summary was prepared only on the basis of exhibits available to her, and the unavailability of evaluations and other data in the personnel files of other Rental Managers affected the comparison between Partin and the other Rental Managers. These omissions and selective inclusions not only indict the reliability of the exhibit—they evidence a deliberate attempt to make Partin look like the worst Rental Manager in Altmanshofer's

region when in fact (at least from the perspective of paperwork errors and untimeliness) she was not.

Thirdly, the termination letter was written less than three weeks after Glick received the probable cause determination from the Metropolitan Human Relations Commission, and less than a week after receiving the proposed Conciliation Agreement. Every alleged deficiency occurred more than four weeks prior to the letter, yet the termination letter was written soon after the probable cause determination.

Finally, Partin was the only one of the principals of this case to receive any discipline for any actions taken up to or after the termination date. Despite the clear language of the May 12, 1983 memo stating that any further use of derogatory terms or language would result in termination, neither Hall nor Mickilini were terminated for such incidents. In the case of Hall, Mickilini himself submitted a memo on August 15, 1983, accusing Hall of calling him a "wop." On Glick's copy of the memo, Altmanshofer noted that another Glick employee, Robert Fieldhouse, had reported that Hall made similar remarks. In the case of Mickilini, Valerie Holley, a Rental Assistant at Woodbridge, reported that Mickilini had told her "I will not be your nigger" when asked why he refused to do certain work assignments given to him by her. No discipline followed either of these incidents. Altmanshofer bent rules to keep Hall and Mickilini employed, but determined that Partin was unsalvageable within ten days of the filing of the discrimination charge, and ultimately fired her because of it.

■ The expert testimony concerning Partin's psychological well-being established that she suffered significant emotional and psychological harm as a result of the harassment and the termination. Dr. Kenneth Bundza, a certified psychologist, performed a psychological assessment of Partin in 1980, well before the harassment at Glick began. He used standardized psychological tests, including the Wexler Adult

Intelligence Test, and the Minnesota Multi-Phasic Inventory. He determined that Partin's overall psychological profile was normal, that there were no indicators of psychopathology, and that Partin did not have a psychotic or neurotic personality. Rick Ritter, a counsellor at the Veteran's Administration Medical Center in Fort Wayne, who has a background in sociology and psychology, saw Partin in counselling from August 15, 1983 until early January, 1984. Ritter, who has expertise in counselling couples involved in domestic violence, found that Partin was distraught, anxious and confused on her first day of counselling, which was the same day as her termination. Counselling of Partin brought out that her employment situation (specifically, the harassment at Glick) had made her feel helpless, fearful of verbal intimidation and depressed.[18]

Dr. James L. Titchener, a licensed psychiatrist, examined Partin and studied the information surrounding this case. He diagnosed that Partin suffered from stress and anxiety, which reached a chronic stage in Spring, 1983. Partin's symptoms included intrusive imagery, intense fear of reliving the stressful events, sleep disorders, aggravation of her neurological condition (palsy),

depression, and loss of interest in work. He testified that Partin is still suffering from the anxiety, and opined that Partin is suffering from Post Traumatic Stress Disorder.[19] Dr. Titchener's expert opinion was that Partin would need two years of two hours a week therapy (at a cost of $70 to $80 per hour) in order to overcome the psychological trauma caused by the harassment at Phase I.[20] This amounts to a total of $16,640.00 in costs for necessary psychological therapy.

In addition, Partin's lost wages, after unemployment compensation is subtracted, amount to $10,895.00. Interest on that amount totaled $1,275.24 as of October 21, 1985.

## Conclusions of Law

Defendant Glick is an employer within the meaning of and subject to the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-1, *et seq.* The Title VII claims of harassment and retaliation were filed in a timely manner with the appropriate agencies, and are now properly before the court. Therefore, the court now turns to the legal sufficiency

18. Ritter's testimony also established that the domestic violence suffered by Partin was due to the harassment at work. Both Partin and Moffett revealed this during counselling sessions. Thus, whether the stress and psychological damage suffered by Partin was because of work or the domestic violence (which has been Glick's theory throughout the trial), it is ultimately related to the harassment at work, in which case Glick's actions in controlling (or failing to control) the harassment had a direct role in causing Partin's psychological and emotional problems. However, the court accepts Ritter's conclusion that the primary cause of Partin's stress and psychological problems was her work situation.

19. Both sides in this case have invested tremendous energy in attempting to prove or disprove the presence of Post Traumatic Stress Disorder (PTSD) in Partin. Yet the issue is largely irrelevant to this case. Whether there is a specific name for it or not, Partin has clearly suffered psychological and emotional trauma which will require treatment. That is certainly sufficient for determining that damages exist. Because the treatment that Partin will need will be the same whether her malady is called PTSD or a

more nebulous form of anxiety and stress, the issue has no real impact for determining the amount of damages either.

20. Glick's attempts to attack Partin's evidence on psychological harm fail completely. Cross-examination of the expert witnesses consisted mostly of either attempting to get the expert to admit that it is possible to "fake" a psychological condition on a test or in a diagnosis, or attempting to have the expert agree that the domestic violence could have caused the stress and psychological problems instead of the harassment at work. Karen Wagner, Rick Ritter, and Dr. Titchener, while recognizing the possibilities, all gave expert opinions indicating that Partin suffered because of the situation at work, and that the domestic violence flowed directly from domestic stress caused by that harassment. This testimony was unrefuted. Even Glick's own witness, Dr. Eugene Levitt, whose testimony the court discredits, admitted that prolonged job harassment could have a "malignant emotional outcome," and that the symptoms found present by Dr. Titchener would require "intensive, uncovering psychotherapy of a prolonged nature that might take six months or more."

of Partin's five claims in light of the facts found above.

### Harassment

Partin sues Glick under both Title VII and 42 U.S.C. § 1981 for the harassment Partin suffered at the hands of Hall and Mickilini. For purposes of this case, the legal analysis under both theories is identical, *see Pinkard v. Pullman-Standard,* 678 F.2d 1211, 1224 (5th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 954 (1983); *Flowers v. Crouch-Walker,* 552 F.2d 1277 (7th Cir.1977); *Bailey v. Binyon,* 583 F.Supp. 923, 925 (N.D.Ill. 1984), so that focusing on Title VII and the case law interpreting it also determines the sufficiency of the harassment claim under § 1981.

■ Title VII provides in pertinent part: It shall be an unlawful employment practice for an employer—

... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race....

Title 42 U.S.C. § 2000e–2(a)(1). The language "terms, conditions, or privileges of employment" is "an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination." *Rogers v. E.E.O.C.,* 454 F.2d 234, 238 (5th Cir.1971) (Goldberg, J., concurring), *cert. denied,* 406 U.S. 957, 92 S.Ct. 1058, 32 L.Ed.2d 343 (1972).

■ A harassment claim does not fit neatly into the usual Title VII method of analysis set forth in *McDonnell-Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as refined by *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *United States Postal Service v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). This analysis, which allows an employer to articulate a justification for its actions once the plaintiff has made out a prima facie case would be inappropriate in the harassment situation, because once a plaintiff establishes that she was harassed and that the employer was involved via respondeat superior, it is hard to see how an employer can justify harassment. As a result, courts ruling on Title VII harassment claims have developed a set of elements which, if proven, constitute a Title VII violation. Those elements are:

(1) the employee belongs to a protected group;

(2) the employee was subject to unwelcome harassment;

(3) the harassment complained of was based on sex (or race);

(4) the harassment complained of affected a term, condition, or privilege of employment;

(5) respondeat superior, that is, that the employer knew or should have known of the harassment and failed to take prompt remedial action; and

(6) the employee acted reasonably under the circumstances.

*Henson v. City of Dundee,* 682 F.2d 897, 909 (11th Cir.1982) (elements 1–5);[21] *DeGrace v. Rumsfeld,* 614 F.2d 796 (1st Cir. 1980) (element 6).[22] As in any Title VII case, the ultimate burden of persuasion

---

**21.** Although *Henson* involved sexual discrimination, the court made clear that it equated sex discrimination with other forms of discrimination, presumably including race. *See Henson,* 682 F.2d at 909. Thus, these elements are applicable to a racial harassment claim as well.

**22.** Other courts formulate the elements differently. In *Katz v. Dole,* 709 F.2d 251 (4th Cir. 1983), the Fourth Circuit adopted a *McDonnell-Douglas*-type analysis by recognizing a two step process, where the plaintiff must show a prima facie case of harassment, and then the employer may rebut by showing that the harassment did not take place or was isolated and trivial. In *E.E.O.C. v. Murphy Motor Freight Lines,* 488 F.Supp. 381 (D.Minn.1980), the court spoke of two "primary conditions" in a harassment claim: (1) more than a few isolated incidents of harassment must have occurred; and (2) the employer must have failed to take reasonable steps to prevent the harassment. *Id.* at 384–85. These forumulations are implicit in the six elements set forth above. The court follows the *Henson* and *DeGrace* formulation because of its ability to better address the legal disputes raised by the facts and the parties in this case.

remains with the plaintiff. *Coates v. Johnson & Johnson,* 756 F.2d 524, 531 (7th Cir.1985). The court therefore considers Partin's harassment claim in light of these six elements.

### 1. Protected Group

■ Glick concedes that Partin belongs to a group which Title VII (and § 1981) were designed to protect. The harassment here is racial, and is based both on Moffett's and Partin's race. Certainly, the consistent use of racially derogatory terms to connote or describe Moffett is racial harassment directed at Moffett, and because of Partin's close personal relationship with him, the harassment impacts on Partin as well. In addition, calling Partin racially-oriented names such a "nigger-lover" is harassment on the basis of Partin's race *as it relates to* Moffett's race. Title VII and § 1981 protect white plaintiffs against discrimination on the basis of their race just as surely as it protects minority plaintiffs. *See McDonald v. Santa Fe Trails Trans. Co.,* 427 U.S. 273, 278–79, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976) (Title VII); *Hicks v. ABT Associates, Inc.,* 572 F.2d 960, 967 (3d Cir.1978) (Title VII); *Faraca v. Clements,* 506 F.2d 956 (5th Cir.), *cert. denied,* 422 U.S. 1006, 95 S.Ct. 2627, 45 L.Ed.2d 669 (1975) (§ 1981). The court therefore concludes that Partin satisfies the first element of a harassment claim.

### 2. Unwelcome Harassment

The *Henson* court defined the second element as follows:

> In order to constitute harassment, this conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive.

682 F.2d at 903. Two cases serve as examples of what kind of conduct can fail to satisfy this element. The first, *Vaughn v. Pool Offshore Co.,* 683 F.2d 922 (5th Cir. 1982), involved an offshore oil rig employee who sued under Title VII alleging that the racial discrimination present in the work environment on the offshore rig caused him to resign. The *Vaughn* court characterized the environment as "rowdy and rough" because "[r]aw pranks, crude practical jokes and verbal abuse abounded, some of it permeated with racial overtones." *Id.* at 923. Terms such as "nigger", "coon", and "black boy" were used to refer to the plaintiff, and the plaintiff joined in using similar terms which "were bandied back and forth without apparent hostility or racial animus." *Id.* at 924. The district court found that the plaintiff engaged in the use of racial slurs and his co-workers felt friendly towards him, so that the work environment was not "dangerously charged with racial discrimination." The plaintiff's Title VII claim therefore failed.[23]

The second case, *Gan v. Kepro Circuit Systems, Inc.,* 27 E.P.D. ¶ 32,379 (E.D.Mo. 1982), involved a claim of sexual harassment. The court described a crude working environment, but one in which the plaintiff actively contributed to the vulgarity. She used vulgar language, initiated sexually oriented conversations, asked male employees about their marital sex lives and whether they would engage in extra-marital affairs, and discussed her own sexual encounters. The court specifically found that any propositions or sexual remarks she received "were prompted by her own sexual aggressiveness and her own sexually-explicit conversations." *Id.* at 23,648. The court ruled that the plaintiff failed to make out a harassment case because "the allegedly harassing conduct was substantially welcomed and encour-

---

**23.** Also important to the *Vaughn* decision was plaintiff Vaughn's perception of the pranks and comments. The court pointed out testimony in which Vaughn stated that he didn't believe the pranks were racially motivated, but rather something to be endured by all. *See* 683 F.2d at 925 and note 4. As the court stated: "Vaughn's

perception of his environment is a significant factor; whether discrimination exists is, by its very nature, often a subjective inquiry." *Id.* This agrees with the second half of *Henson's* definition of this second element, which looks at the employee's perception of the harassment as undesirable.

aged by plaintiff. She actively contributed to the distasteful working environment by her own profane and sexually suggestive conduct." *Id.* at 23,649.[24]

■ Glick has tried to argue that the harassment directed at Partin was "solicited" and "incited" by her. Glick's view of the facts is that Hall and Mickilini never used derogatory language about Moffett in Partin's presence except when Partin told them of her problems with Moffett and asked for advice. Of course, that view depends on believing Hall and Mickilini's testimony concerning the events between them and Partin. As noted previously, the court discredits their testimony as to those events. Their vulgar comments were not solicited or incited by Partin.

An issue related to this is Partin's own use of vulgar language. Glick's counsel asserted at final arguments that Partin used racially derogatory terms to refer to Moffett, so that the use of such terms by other Glick employees could not be unwelcome because Partin's use of the terms solicits, incites and therefore welcomes the use of the terms by others. In addition, although this relates more to the fourth *Henson* element, Glick argues that Partin's use of such terms "set the atmosphere" of the workplace so that Hall and Mickilini's use of the terms could not alter the conditions of the workplace. The court analyzes both aspects of this issue under the second *Henson* element.

The court has made a factual finding that Partin used vulgar language at the Phase I rental office, but did not use racially-oriented language there. Thus, Partin at best welcomes use of vulgar terms, but *did not* welcome racially derogatory terms. The atmosphere Partin set (if it is indeed possible for one person to "set the atmosphere" of an entire office) was perhaps crude, but was also free of racial discrimination. To introduce racially-oriented terms like "Black Bart", "nigger' and "nigger lover" into the environment would alter the "color free" atmosphere Partin set.

The more disturbing implication in Glick's argument is that a single utterance or a small number of utterances of racial terms can result in a forfeiture of a harassment claim because it irrevocably changes the atmosphere of the workplace. The core of Glick's position is that a harassment plaintiff must be a saint in a den of sinners.

■ The court rejects such a high standard of conduct. The *Vaughn* and *Gan* cases provide contrasts that suggest a more reasonable approach to judging a plaintiff's conduct. In *Vaughn*, the plaintiff engaged in the racially derogatory banter and the court found no apparent hostility or racial animus. In contrast, Partin did not engage in using racially oriented language, while Hall and Mickilini did so on a regular, daily basis despite entreaties to stop. Rita Hamrick's and Osama Abdulrahim's testimony indicated both Hall and Mickilini's animus toward Partin because she dated black men. Clearly, racial animosity existed and was directed toward Partin. In *Gan*, every comment or proposition was directed to the plaintiff because she had solicited such activity. Hall and Mickilini harassed Partin despite her entreaties to stop. Her coarse language cannot be construed to solicit racial discrimination and animosity on a regular basis. The court therefore concludes that the harassment Partin received was unwelcome, thus satisfying the second *Henson* element.[25]

24. Glick also cites *Johnson v. Richmond County,* 507 F.Supp. 993 (S.D.Ga.1981), as being in accord with the cases (specifically *Vaughn*) concerning "unwelcome" harassment. However, *Johnson* does not involve the issue of the plaintiff's solicitation or incitement of harassment, and therefore does not apply here.

25. Even if the court were to accept (which it does not) that Partin used the term "black bastard" once (as that is all that the testimony in this case suggests, *see* note 8, *supra* ), it would still find that the harassment was unwelcome. It is unrealistic to believe that one comment justifies over seven months of regular, racially oriented abuse. The solicitation and incitation referred to in *Henson* is situational; the *Vaughn* plaintiff "solicited" or incited racial comments by engaging in the crude conversations with other employees, while the *Gan* plaintiff initiated conversations and comments, so that *all* harassment was traced to her encouragement of

### 3. Harassment Based on Race

The third *Henson* element requires that the harassment was based on race because "[t]he essence of a disparate treatment claim under Title VII is that an employee or applicant is intentionally singled out for adverse treatment on the basis of a prohibited criterion." *Henson*, 682 F.2d at 903. The plaintiff must therefore show that "but for" the fact of her race, she would not have been the object of harassment. *Id.* at 904, citing *Bundy v. Jackson*, 641 F.2d 934, 942–43 (D.C.Cir.1981) and *Tomkins v. Public Service Elec. and Gas Co.*, 568 F.2d 1044, 1047 n. 4 (3d Cir.1977).

Glick has argued that Hall and Mickilini's dislike for Moffett (and, in turn, their abusive treatment of Partin) occurred because of a personal dislike for Moffett based on Moffett's personality and his mistreatment of Partin, without any reference to Moffett's race. This position rests upon the discredited testimony of Hall and Mickilini. The evidence in this case establishes both that Hall and Mickilini disliked blacks, and specifically objected to Partin's dating blacks. Hall told Rita Hamrick that Partin likes "niggers" and was seeing a "black buck nigger named John." Mickilini told Osama Abdulrahim that Partin "only goes out with niggers." This testimony suggests a racial, not a personal, basis for Hall's and Mickilini's dislike for Moffett, as well as for Partin's dating Moffett. The court therefore finds that Hall and Mickilini's harassment was based on race, and the third *Henson* element is satisfied.

### 4. Harassment Affects Terms, Conditions, and Privileges of Employment

Justice Goldberg's opinion in *Rogers v. EEOC* made clear that an employee's "psychological as well as economic fringes are statutorily entitled to protection from employer abuse" because "the relationship between and employee and his working environment is of such significance...." 454 F.2d at 238. Several courts have subsequently read *Rogers* as recognizing that a discriminatory work environment can constitute a Title VII violation. *Gilbert v. City of Little Rock*, 722 F.2d 1390, 1394 (8th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984); *Henson*, 682 F.2d at 901–02; *Taylor v. Jones*, 653 F.2d 1193, 1199 (8th Cir.1981); *Bundy v. Jackson*, 641 F.2d 934, 944–46 (D.C.Cir. 1981); *Firefighters Institute for Racial Equality v. City of St. Louis*, 549 F.2d 506, 514–15 (8th Cir.), *cert. denied*, 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977); *Snell v. Suffolk County*, 611 F.Supp. 521, 524 (E.D.N.Y.1985); *EEOC v. Murphy Motor Freight Lines*, 488 F.Supp. 381, 384 (D.Minn.1980).

In order to establish a Title VII violation, however, a plaintiff must establish that the harassment was sufficiently pervasive to create a discriminatory work environment. As Justice Goldberg stated:

... I do not wish to be interpreted as holding that an employer's mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee falls within the proscription of Section 703....

454 F.2d at 238. Rather, the harassment must be "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Henson*, 682 F.2d at 904.

What constitutes "sufficiently pervasive" harassment has been the subject of a number of cases. The harassment cannot be isolated or sporadic, *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir.1983); *Taylor v. Jones*, 653 F.2d 1193, 1199 (8th Cir.1981); *Bundy v. Jackson*, 641 F.2d at 943 n. 9; *Snell*, 611 F.Supp. at 525; *Ellison v. Best Foods*, 598 F.Supp. 159, 163 (E.D.Ark.

---

such activities. In both of these cases, the plaintiff's "welcoming" occurred with each harassing act. In contrast, a single use of a racial term may excuse racial comments in that situation, but not continuous racial harassment over a period of months. Hall and Mickilini's abuse

was several levels of severity and frequency higher than that welcomed by one racial comment. This exponential difference convinces the court that Hall and Mickilini's harassment cannot be excused by one racial comment, so that Partin did not welcome that harassment.

1984); *Weiss v. United States,* 595 F.Supp. 1050, 1056 (E.D.Va.1984), nor merely a part of casual conversation. *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir. 1981); *Cariddi v. Kansas City Chiefs Football Club, Inc.,* 568 F.2d 87, 88 (8th Cir.1977); *EEOC v. Murphy Motor Freight Line,* 488 F.Supp. 381, 384 (D.Minn.1980). Rather, the plaintiff must show a "concerted pattern of harassment," *Fekete v. U.S. Steel Corp.,* 353 F.Supp. 1177, 1186 (W.D.Pa.1973), such as a "steady barrage of opprobrious racial comment," *Johnson,* 646 F.2d at 1257, which is "so excessive and opprobrious" that it constitutes a violation of Title VII. *Cariddi,* 568 F.2d at 88. The court in *Weiss,* a case involving discrimination on the basis of religion, summarized the law this way:

An occasional offensive religious epithet by a co-worker does not necessarily give rise to a Title VII claim against an employer. Nonetheless, when an employee is repeatedly subjected to demeaning and offensive religious slurs before his fellows by a co-worker and by his supervisor, such activity necessarily has the effect of altering the conditions of his employment within the meaning of Title VII ... Continuous abusive language, whether racist, sexist, or religious in form, can often pollute a healthy working environment by making an employee feel uncomfortable or unwanted in his surroundings. In more extreme cases ... it can even severely affect the employee's emotional and psychological stability.

595 F.Supp. at 1056 (citation omitted).

 The evidence in this case established that Partin was subjected to a continuous pattern of harassment by Hall and Mickilini over the course of several months. When Partin began dating Moffett in October, 1982, Mickilini began harassing her about dating a "nigger", threatening to "kick her ass" and refusing to remove his motorcycle from her garage. Racially and sexually oriented comments directed at Partin were commonplace in the rental office in November-December, 1982, and continued to occur on a regular basis at least

until May, 1983. Regular, almost daily exposure to terms such as "stupid cunt", "whore", "bitch" and "nigger lover" over the course of six to seven months, is, by any definition, a concerted pattern of continuous harassment which pollutes a working environment.

### 5. Respondeat Superior

The fifth element of a harassment claim focuses on the employer's involvement in, reaction to, and control of the harassment. Generally, respondeat superior in the harassment context focuses on two factors: the employer's knowledge of the harassment and its remedial response to it.

 To show employer knowledge, a harassment plaintiff must show that the employer knew or should have known of the harassment in question. *Katz v. Dole,* 709 F.2d at 256; *Henson,* 682 F.2d at 905; *Weiss,* 595 F.Supp. at 1057; *Coley v. Consolidated Rail Corp.,* 561 F.Supp. 645, 649-50 (E.D.Mich.1982); *Martin v. Norbar, Inc.,* 537 F.Supp. 1260 (S.D.Ohio 1982); *Murphy Motor Freight Lines,* 488 F.Supp. at 385. Employer knowledge can be established by showing that the plaintiff complained to higher management of the harassment, *Henson,* 682 F.2d at 905; *Bundy v. Jackson,* 641 F.2d at 943, or by showing that the intensity and pervasiveness of the harassment was such that one can infer actual or constructive knowledge of it by the employer. *Katz,* 709 F.2d at 256; *Henson,* 682 F.2d at 905; *Croker v. Boeing Co. (Vertol Div.),* 437 F.Supp. 1138, 1194 (E.D.Pa.1977).

 Once an employer knows of the harassment, a plaintiff must show that the employer failed to take prompt and adequate remedial action. *Henson,* 682 F.2d at 905; *DeGrace,* 614 F.2d at 805; *Coley v. Consolidated Rail Corp.,* 561 F.Supp. at 651; *Martin v. Norbar, Inc.,* 537 F.Supp. at 1262. What constitutes "adequate" remedial action depends upon the facts of the case. Several courts have made it clear that employers cannot be responsible for every offensive remark made at the work-

place precisely because an employer cannot change the personal beliefs of its employees. *See Katz,* 709 F.2d at 256; *DeGrace,* 614 F.2d at 805; *Howard v. National Cash Register Co.,* 388 F.Supp. 603, 606 (S.D. Ohio 1975). Once an employer knows of harassment, however, it "can let it be known ... that racial harassment will not be tolerated, and he can take all reasonable measures to enforce this policy...." *DeGrace,* 614 F.2d at 805. This involves more than merely indicating the existence of an official policy against harassment or discrimination. *See Katz,* 709 F.2d at 256; *Weiss,* 595 F.Supp. at 1057. The measures required are reasonable affirmative steps to "eliminate the harassment," *Murphy Motor Freight Lines,* 488 F.Supp. at 385, which "maintain an atmosphere free of racial intimidation and insults." *Croker,* 437 F.Supp. at 1191. *See e.g.,* EEOC Decision No. 74–25 (1973). While the proper response will always vary with the circumstances, the overriding principle in this aspect of the respondeat superior element is that an employer who tolerates harassment or discrimination violates Title VII. *Taylor v. Jones,* 653 F.2d at 1199; *DeGrace,* 614 F.2d at 805.

In this case, the issue of respondeat superior presents three subsidiary issues: (1) whether the managerial position of Partin vis-a-vis Hall and Mickilini precludes Glick's liability for the harassment; (2) Glick's knowledge of the harassment; and (3) Glick's response to the harassment. The court considers each of these subsidiary questions in turn.

### a. Partin's Managerial Position—Harassment by "Subordinates"

Glick has maintained throughout its briefs and arguments that it cannot be liable for any harassment by Hall and Mickilini because they were subordinates to Partin. Glick points to the overwhelming majority of harassment cases, and notes that the "harasser" was a supervisor or co-worker, and that no case involved harassment by a subordinate. To Glick, this means that the burden on a plaintiff alleging harassment by a subordinate was so great as to be "insurmountable."[26]

The court has found as a matter of fact that the maintenance staff was independent of the Rental Manager at a Glick complex by virtue of the assignment of hiring, firing, training and supervision authority to persons other than the Rental Manager. Hall, as Maintenance Superintendent, was under the supervision of both Partin as Rental Manager and Altmanshofer as Regional Property Manager. The evidence in this case led the court to find that Partin could not discipline Hall or Mickilini. (See note 3, *supra*). While Glick points to the general language of the job description and the testimony of several Rental Managers that the Manager is "responsible" for the complex, the court does not find that sufficient evidence of a supervisor-subordinate relationship between a Rental Manager like Partin and a Maintenance Supervisor like Hall or a Maintenance Assistant like Mickilini. The court interprets the responsibility language as more of a recognition of liability (that the Rental Manager will get in trouble, or "be responsible", for failures to meet Glick maintenance standards) than a bestowal of supervisory power, especially in light of the fact that the Rental Manager's job description specifically states that the supervisory function is given to the Regional Maintenance Superintendent.

▆▆▆▆▆ In short, the court finds that there is no supervisor-subordinate relationship between Partin and her harassers. Although Partin enjoys a higher position in the Glick managerial hierarchy, her relation to Hall and Mickilini is closer to a co-worker relationship, with Altmanshofer as their common supervisor. Thus, the fac-

---

**26.** Glick's counsel had to back off from this position at final argument because of Partin's citation of *Erebia v. Chrysler Plastic Products,* 772 F.2d 1250 (6th Cir.1985), where the Sixth Circuit upheld the liability portion of a verdict against an employer in favor of a Mexican supervisor who claimed he was subjected to racial and ethnic slurs by an employee he supervised. This admission does much to undercut what little persuasive appeal Glick's argument had.

tual premise of Glick's argument is incorrect.

The dispute about the nature of Partin's managerial relationship to Hall and Mickilini, however, is something of a red herring, for this court is convinced that the relationship between the parties is immaterial to the question of whether plaintiff could be harassed in violation of Title VII.[27] As the *Henson* court, which Glick cited to several times in its briefs, stated:

> The environment in which an employee works can be rendered offensive in equal degrees by the acts of supervisors, *see Bundy*, 641 F.2d at 943; *Compston v. Borden*, 424 F.Supp. at 160–61, co-workers, *Friend v. Leidinger*, 588 F.2d at 68 (Butzner, J., concurring in part and dissenting in part), or even strangers to the workplace, *EEOC v. Sage Realty Corp.*, 507 F.Supp. 599, 609–10 and n. 16 (S.D.N.Y.1981); 29 C.F.R. § 1604.11(e) (1981). The capacity of any person to create a hostile or offensive work environment is not necessarily enhanced or diminished by any degree of authority which the employer confers on that individual.

682 F.2d at 910. In fact, the only role which the managerial relationship plays in a harassment case is to determine the level of employer culpability. The *Henson* court holds that an employer is strictly liable for harassment by a supervisor which results in tangible job detriment,[28] while a plaintiff asserting a claim based on a discriminatory work environment must show that the employer knew or should have known of the harassment. *Id.*[29] The required quantum

of proof may change, but not the potential for liability. Thus, the Sixth Circuit in *Erebia v. Chrysler Plastic Products Corp.*, 772 F.2d 1250 (6th Cir.1985), affirmed the liability portion of a jury verdict in favor of a supervisor harassed by subordinates. The issue of the plaintiff's status as supervisor of those harassing him was not even raised precisely because it is a non-issue—a court looks to an employer's knowledge of and response to harassment regardless of the relationship between the parties. The court therefore concludes that, provided the elements of respondeat superior are present, Glick can be held liable for Hall and Mickilini's harassment of Partin.

#### b. Glick's Knowledge

The facts of this case establish that Glick knew of Hall and Mickilini's harassment of Partin. The harassment began in October, 1982, when Partin began dating Moffett, and became a regular, commonplace occurence in the Phase I rental office in November-December, 1982. Partin told Altmanshofer of the harassment at a dinner in early December, 1982. While Partin did not request Altmanshofer's assistance at that time, she did put Altmanshofer (and Glick) on notice that some harassment was occurring. Partin also told Altmanshofer of the threat to steal the spoiler off Moffett's Trans Am at the 1982 Christmas party.

At the February 1, 1983 meeting, Altmanshofer learned of continuing harassment, and of the "flag pole" comment, the

---

**27.** The Seventh Circuit has expressly reserved the question as to whether an employer can be liable for sexual harassment by a plaintiff's co-employee. *Horn v. Duke Homes*, 755 F.2d 599, 602 n. 2 (7th Cir.1985). However, the footnote cites to four cases (*Katz, Henson, Bundy* and *Barrett v. Omaha National Bank*, 726 F.2d 424 (8th Cir.1984)), which recognize the possibility of employer liability for co-worker harassment (although applying the requirement that the plaintiff show the employer knew or should have known of the co-employee's harassment). While *Horn* states no opinion, citation to these cases indicates recognition of this emerging majority position.

**28.** The classic example of a tangible job detriment occurs where a supervisor demands sexual consideration in exchange for employment, promotion, or some other benefit of employment— what is referred to as a *quid pro quo* case of sexual harassment. The failure to obtain the benefit because of refusal to submit to the supervisor's propositions is the tangible detriment suffered by the employee.

**29.** The EEOC also sets up a two-tiered standard based on managerial status in 29 C.F.R. § 1604.-11, where the degree of employer knowledge necessary to violate Title VII depends on whether a supervisor or co-employee committed the harassment.

references to picketers at K–mart, and the sexual comments and names directed at Partin personally. She informed her supervisor, Jack Kline, of the problems in a memo shortly after the meeting. After the February 22, 1983 incident involving Mickilini, Altmanshofer informed Partin she was tired of hearing complaints and that if Partin did not stop bringing them up, she and everyone else would be fired. Finally, in the May 12, 1985 memo, Altmanshofer admitted knowing of the harassment over a period of time when she wrote: "It has been brought to my attention that some staff members are *continuing* to indulge in and make derogatory and discriminatory remarks during office hours and within the project." (Emphasis supplied.)

Upper management knew of the harassment as well. Altmanshofer's memo to Kline soon after the February 1, 1983 meeting alerts him that Partin believed she was being harassed because Moffett was black. Altmanshofer's memo of May 13, 1985 informs Kline that the "snide remarks and innuendos" are occurring and that Partin believes the remarks will continue.

■ Based on these facts, the court concludes that Glick knew of the harassment that was occurring at Phase I, and that this knowledge was sufficiently great so as to satisfy the first aspect of the element of respondeat superior.

### c. Glick's Response

Given Glick's knowledge of the harassment, the crucial aspect of the respondeat superior element here is whether Glick took "reasonable affirmative steps" so as to evidence intolerance for the harassment and adequately respond to it.

Glick's first knowledge of the harassment came at the December, 1982 dinner. Partin specifically did not ask for help from Altmanshofer because she believed she could stop the harassment on her own. Altmanshofer said she would speak to Hall and Mickilini, and in light of Partin's desire to solve the problem herself, Altmanshofer's response was probably adequate at that time. Upon learning of the threat to steal the spoiler at the Christmas party, Altmanshofer advised Partin that she should not drive the Trans Am to work so that Hall and Mickilini could not damage it. This advice evidences a desire to deal with the problem of the harassment by avoidance; instead of confronting the problem directly, by going to Hall and Mickilini directly and demanding that the threats stop, Altmanshofer chose the path of least resistance. This attitude surfaced again at the February 1, 1983 meeting, when Altmanshofer banned Moffett from the rental office, believing that if Moffett were not present to see what Hall and Mickilini did, then he would not get upset about their actions.

The next chance for Altmanshofer to do something about the harassment was on February 1, 1983, when Partin informed her that the harassment was continuing and getting worse. However, Altmanshofer proposed no solutions, instead asking Partin to suggest what she thought should be done. Partin, apparently still hopeful that Hall and Mickilini could be persuaded to cease, thought that a meeting between the parties involved might help. In effect, Altmanshofer's response was passivity, leaving to Partin the decision as to what would be best in the situation. Upon learning at the meeting of the various comments that had been made to and about Moffett and Partin, Altmanshofer did nothing to punish Hall or Mickilini, nor took any action directed at them alone to evidence her and Glick's displeasure with the harassment that had been discussed at the meeting. Rather, she issued a memo to Hall, Mickilini and Partin accusing "all parties involved" of "unprofessionalism." Thus, Partin was treated the same as her harassers.

In response to Mickilini's verbal abuse of Partin on February 22, 1983, Altmanshofer did threaten Mickilini that he would be fired "if any further incident whatsoever occurred again." However, Partin was again castigated for unprofessionalism. Altmanshofer expressed a desire to avoid the situation when, in the February 23,

1983 memo to Partin on the incident, she stated that "I expect you to act in a professional, quiet and efficient manner during your tenure as a Glick employee." When Partin complained that the directive in the February 23 memo requiring all communication with staff be in writing, Altmanshofer told Partin that she was tired of hearing complaints and that if bringing them up did not stop, everyone including Partin would be fired. The message was clear: Altmanshofer did not want to hear of the problems at Phase I apparently because of the same "hear no evil, see no evil" attitude which motivated her ban of Moffett from the rental office.

Altmanshofer's passive response to the harassment reached its height in the May 12, 1983 memo which Hall, Mickilini, Partin, Talementez, Guevara and Mark Garr signed. Altmanshofer stated that the harassment was continuing, and reiterated the Glick policy against discrimination. She stated that if any employee made any further remarks, he or she would be terminated immediately by Partin, who was given the authority to fire in the memo. This response, despite Glick's characterization to the contrary, was inadequate for at least two reasons. First, at least with respect to Mickilini, Altmanshofer had already threatened that any further incident would result in his being fired. The emptiness of that threat after the February 22, 1983 incident is apparent in that the May 12 memo gives Mickilini another chance, despite the fact that Partin had told Altmanshofer of Mickilini's continuing harassment after the February threat. Once again, instead of enforcing her own threat, Altmanshofer backed off. Second, despite the fact that Altmanshofer had the authority to fire employees, Altmanshofer removed herself from the situation by passing that authority to Partin. That is not so much a re-sponse to the harassment as it is an abdication of responsibility. It indicates Altmanshofer's desire to avoid dealing with the harassment, not a forceful response to the situation at Phase I.

In short, Altmanshofer evidenced a desire to, and in fact did, avoid meaningful involvement in removing the harassment from Phase I. Instead of confronting the problems head on, she did not want to hear about them, did not offer constructive proposals to eliminate it (except for the May 12 memo), and did not exhibit any significant intolerance towards the harassment. She castigated Partin, and wanted a "quiet" employee who would not bring tiresome complaints to her attention.

From an objective standpoint, Altmanshofer's responses were inadequate as well. The February 1, 1983 meeting was Partin's idea, not Altmanshofer's. Despite learning of the harassment at that meeting, Altmanshofer did not discipline Hall or Mickilini; she simply told them to be more professional. Her threat after the February 22 incident was empty; she did not exercise it on May 12, nor on June 15, when Mickilini was transferred to another complex at Partin's request, nor in October, 1984, when Valerie Holley, a Rental Assistant at Woodbridge, reported that Mickilini had said that he would not be "her nigger." The power to fire given Partin in the May 12 memo was taken away from her within a matter of days. The memo's threat that any further discriminatory remarks would result in dismissal was obviously hollow; she did not fire Mickilini after the October, 1984 incident at Woodbridge, and did not fire Hall after Mickilini accused Hall of calling him a "wop" in an August 15, 1983 memo, on which Altmanshofer noted that another Glick employee told her that Hall had made similar remarks.[30] The transfer

---

30. One of the arguments which Glick offers to justify the failure to take any disciplinary action against Hall and Mickilini is that there was no corroborating evidence for Partin's allegations. Here, however, Altmanshofer herself produced the corroborating evidence—Robert Fieldhouse told her that Hall was making discriminatory remarks. In light of the May 12 memo, which Glick maintained had never been rescinded up to the day of Partin's firing, Hall should have been fired without any further warning. Instead, no action was taken. This indicates Altmanshofer's toleration of the harassment in general and Hall's discriminatory remarks in particular.

of Mickilini in June, while perhaps commendable, was far short of adequate in light of the February 23 threat to fire for any further incidents.

■ In short, the court finds that Altmanshofer evidenced a desire to avoid dealing with the harassment she knew about, and responded to Partin's request for help with inadequate policies and empty threats which appear designed more to avoid bringing the problem to her attention than solving it. The failure to take any affirmative steps to end the harassment did nothing to discourage further harassment, and allowed Hall and Mickilini to continue harassing Partin over the course of several months. These responses to the situation at Phase I were totally and completely inadequate, and were not the type of prompt remedial action required by Title VII.

■ As noted before, the overriding principle in this aspect of respondeat superior is that the employer should not tolerate discrimination. However, evidence of toleration abounds in this case. The wholly inadequate response of Glick is strong evidence of a toleration of discrimination in and of itself. Yet direct evidence also exists. As noted before, Altmanshofer told Partin at the Christmas party that if Partin was going to pursue dating Moffett, she would have to get used to things like threats to steal the spoiler off Moffett's car. This points to only one thing: a belief that threats like this are common and nonobjectionable because of the interracial na-

ture of the relationship between Partin and Moffett.[31] This racially-based animus no doubt played a role in Altmanshofer's inadequate responses to the harassment, her castigation of Partin, and in her failure to discipline Hall and Mickilini under the terms of the May 12 memo. The most convincing evidence of Glick's toleration of the harassment can be found in the memo of Jack Kline to Altmanshofer on May 16:

> Becky, I'm afraid if Sue is entering into this relationship she had better be prepared to get snide remarks from just about anyone and everyone. I don't think inter-marriages are accepted in our society today and although you and I certainly would not say anything, I am not sure we can keep them from saying things.

Such language is a clear indication that Partin would just have to suffer because of her race, and that Kline is willing to tolerate such suffering because interracial marriages are not accepted in society. These two facts are convincing evidence of Glick's toleration of the harassment occurring at Phase I, the kind of toleration which violates the overarching principle contained in the respondeat superior element of an harassment claim. This toleration is also ample evidence of an intent to discriminate against Partin on the basis of her race because it shows that Glick would not act against Partin's harassers due to an intolerance for interracial relationships. This court therefore finds that the fifth element of the harassment claim has been established.[32]

---

31. No other explanation offered can explain this remark. Glick has maintained that the comments about Moffett were based on a personal dislike for Moffett because he beat Partin, and not because he was black. On the date of the Christmas party, no such beatings had yet occurred, so that Altmanshofer's comment could not be based on that. The only aspect of dating Moffett that could generate animosity would be the interracial nature of the relationship because it was the only thing different about the relationship that was evident to Altmanshofer.

32. Glick attempts to argue that its actions were adequate and prompt remedial action on the basis of *Bell v. St. Regis Paper Co.*, 425 F.Supp. 1126 (N.D.Ohio 1976). Glick makes particular

reference to the fact that the *Bell* court found that holding a meeting between the parties involved and refusing to discipline employees without corrobative evidence was an adequate response to allegations of harassment. *See id.* at 1137. The court finds *Bell* inapposite for several reasons. First, the *Bell* court found that the employer had made several other meaningful responses to the harassment alleged. When the plaintiff first complained of harassment, the employer had a local black minister consult with the plaintiff, and transferred her to another shift. The company also reminded its employees of the company rules regarding harassment. When subsequent complaints were made by the plaintiff, the company interviewed the

### 6. Partin's Actions

The final element of a harassment claim is that the plaintiff must have acted reasonably under the circumstances of the case. Generally, the cases which discuss this element involved action by the plaintiff which bordered on the unreasonable. In *DeGrace v. Rumsfeld,* the plaintiff failed to report to work allegedly out of fear of the racial harassment present in his work environment. The length of the periods of his unexplained absences from his job suggested unreasonable action on his part. In *Grayson v. The Wickes Corp.,* 450 F.Supp. 1112 (N.D.Ill.1978), *aff'd,* 607 F.2d 1194 (7th Cir.1979), the court found that the plaintiff's condition as an unwed pregnant woman had destroyed her credibility and respect with her staff so that she was an ineffective manager. In *Higgins v. Gates Rubber Co.,* 578 F.2d 281 (10th Cir.1978), the plaintiff struck a co-worker with a metal bar in response to harassment. These unreasonable actions led the courts to reject (or, in *DeGrace,* to remand for further consideration) the harassment claims. These cases suggest that a court must look at the plaintiff's actions in the context of the work environment in which that plaintiff worked, judging the reasonableness of the actions as a whole.

■ It appears that Glick believes that Partin acted unreasonably in three ways: by discussing her personal life with her subordinates; by soliciting the harassment through engaging in the use of vulgar language herself; and through her remaining with Moffett after he beat her. None of these actions are unreasonable so as to justify excusing Glick's tolerance of the harassment. The court believes that Partin's discussions of her personal life, while perhaps indiscreet, are not unusual aspects of the day to day activities of a small office staff. The few employees on a staff naturally talk to one another during the working day, and events in their personal lives can occasionally be a part of these casual conversations. Partin was apparently more willing to talk about her personal life than other staff employees at Phase I, but that does not put her actions outside the bounds of reasonable conduct as the excessive absences of the plaintiff in *DeGrace* or the physical assault by the plaintiff in *Higgins.* Her discussions may have bothered her fellow workers, but that certainly does not justify seven months of constant harassment. The issue of Partin's use of racially derogatory terms has already been discussed; the court has concluded that she simply did not engage in that activity. Finally, Partin's staying with Moffett after he beat her, while perhaps questionable to an outsider to the relationship, was not unreasonable. The court has found that the beatings were a direct result of the harassment; Glick's liability had attached long before Partin decided to remain with Moffett. Glick's attempt to compare Partin to the plaintiff in *Grayson* is inapposite. In *Grayson,* the derogatory comments and lack of respect in the office was due to the plaintiff becoming pregnant outside of marriage. Her "unreasonable" action was the cause of the harassment and lack of respect which led to her discharge. Here, the harassment was due to Hall and Mickilini's racial dislike for Moffett and for Partin's involvement with a black man. The harassment was in no way related to the

alleged harassers, reminded them of company rules, and took short statements. Eventually, the minister was called in again in an effort to avoid problems with the union should the employees be disciplined. Meeting were held with management to discuss the harassment, and the employer made a short agreed statement with the union concerning discrimination in the workplace which was posted in the plant. These actions represent a sincere desire to work with a complaining employee to resolve the work environment situation. By contrast, Glick's response here was an attempt to avoid confronting the problem by telling Partin not to complain about it or by abdicating authority to discipline its employees. The fact that a meeting was held on February 1, 1983 is hardly sufficient in light of the totality of Glick's response. The failure to act because of an alleged lack of corroboration is pretextual—Glick sought no corroboration in part because it condoned the harassment of Partin. None of the cases cited by Glick, and *Bell* in particular, offer a justification for Glick's toleration of constant discriminatory harassment.

fact of Partin's remaining with Moffett after he beat her, except perhaps that it allowed Hall and Mickilini further opportunities to harass Partin. Glick should not be able to avoid liability because of Partin's family problems when Glick's failure to remedy the harassment at Phase I caused those family problems.

■ Partin's other actions in this case were reasonable. Glick has referred (although not in connection with this element of the harassment claim) to Partin's failure to document the harassment, failure to initiate disciplinary proceedings against Hall and Mickilini, and failure to fire Hall and Mickilini for the few days that she had the authority to fire them. It appears that a failure to document or initiate discipline is irrelevant to the question of harassment here. Partin informed Glick of the problem early on and continued to try to inform Glick until Altmanshofer vocalized her desire to turn a deaf ear to Partin's pleas for help. While the failure to document or discipline may be relevant to establishing whether or not Partin's allegations are true, they are not standards by which to measure the reasonableness of an employee's actions. Partin's failure to fire Hall and Mickilini after briefly getting the authority to do so was not unsual. She only had it for five days, and could only exercise it upon a further occurrance of discrimination. She was afraid of the authority Altmanshofer had abdicated to her, and rightfully so, given that such authority had always been someone else's to wield.

The court finds that Partin acted reasonably throughout the relevant time period of this case. Therefore, the court finds that Partin has satisfied this sixth and final element of her claim. With all six elements of the harassment claim satisfied, the court concludes that Glick is liable under Title VII and § 1981 for the harassment of Partin.

### Retaliation Claims

■ Section 704(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a), provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." In general, a plaintiff seeking to hold an employer liable under this section must show that (1) she participated in a proceeding under Title VII; (2) she suffered an adverse employment action by her employer; and (3) a causal connection between the two. *Klein v. Trustees of Indiana Univ.*, 766 F.2d 275, 280 (7th Cir.1985).

■ While a retaliation claim generally follows the *McDonnell-Douglas* paradigm of shifting burdens of production, it is clear that after a trial has been held, there is no need to determine whether the plaintiff has made out a prima facie case. *United States Postal Service Bd. of Govs. v. Aikens*, 460 U.S. 711, 714–15, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983); *Suson v. Zenith Radio Corp.*, 763 F.2d 304, 307 (7th Cir.1985). The court must simply proceed to the question of discrimination vel non— that is, whether the employer intentionally discriminated against the plaintiff. *Aikens*, 460 U.S. at 715, 103 S.Ct. at 1482; *McCluney v. Jos. Schlitz Brewing Co.*, 728 F.2d 924, 926 (7th Cir.1984). After a trial, this involves a decision as to which party's explanation of the employer's motivation the court will believe. *Id.*

Although the court will not be following the three step approach of *McDonnell-Douglas*, the concepts behind the second and third steps are directly implicated in this case. The second step allows an employer to articulate legitimate, nondiscriminatory reasons for its actions, while the third step allows the employee to show that the reasons articulated are merely pretextual. 411 U.S. at 804, 93 S.Ct. at 1825. Glick has articulated several reasons to justify its firing of Partin, and Partin has offered evidence which convinces this court that those reasons are pretextual. This section of the opinion will provide the legal justification of that conclusion.

There is no real dispute as to the first two elements of Partin's retaliation claim. Partin filed a harassment charge on May 20, 1983, and was terminated on August 15, 1983. The dispute here relates to causation—was Partin fired because she filed her harassment claim? The Seventh Circuit has made it clear that it applies a "but for" standard to the causation element of a retaliation claim. *McCluney,* 728 F.2d at 928; *Serkow v. State of Wisconsin Dept. of Public Instruction,* 630 F.2d 498, 502 (7th Cir.1980). Partin must therefore show that but for her filing of the harassment charge she would not have been fired.

Before discussing the causation issue, the court pauses to consider the issue of what evidence concerning Partin's termination can be considered here. The ultimate factual inquiry in a Title VII case is "whether the defendant intentionally discriminated against the plaintiff," *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The factfinder looks to see if "the employer [is] ... treating some people less favorably than others because of their race, color, religion, sex, or national origin." *Furnco Const. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). The critical issue is the employer's motivation *at the time of the termination,* as that is the time when the employer's motive manifests itself in the act of termination.

From an evidentiary standpoint, the fact that the court must determine the employer's motive at the time of termination necessarily means that the court can only consider that evidence which the employer knew at that time. The *McDonnell-Douglas* paradigm, which allows an employer to articulate nondiscriminatory reasons for the termination, cannot be viewed as sanctioning the use of subsequently discovered facts to justify that action. If an employer were able to discover subsequent facts about an employee and to use those facts in defense of her termination, it would be very easy to cover up a discriminatory motive by offering facts which played no role in the decision as the reason for the firing. An employee would be forced to have a spotless employment record in order to have any hope of success on a retaliation claim. Such a cover-up mechanism would be inimical to the policy underlying Title VII, which seeks to hold employers responsible for employment decisions based on discriminatory motives. For these policy reasons, courts must consider only that evidence available to the employer at the time of the termination decision in order to be able to accurately assess the employer's motive.

This policy decision has an important role in this case. Glick has attempted to justify its termination decision by pointing out the poor working habits of Partin, such as her spending time with Moffett at the office, her excessive time spent on personal phone calls, the condition she kept the office in, her attitude towards Altmanshofer and other facts designed to impugn Partin's competence which were not listed in the termination letter nor established by the evidence as having been available to Altmanshofer at the time of termination. While those facts might serve some other purpose, they cannot be considered for purposes of the causation element of these retaliation claims. In fact, it appears that the only competent facts which go to the claims are those listed in the termination letter. The letter is the articulation of Glick's reasons for termination; it strains credibility to believe that Glick would have left out other condemning facts it had relied upon, especially in light of the fact that the letter itself states, "Please be aware that your termination is a result of the combination of the foregoing deficiencies." The court therefore limits itself to the reasons and facts set forth in the termination letter.

### Glick's Articulated Reasons for Partin's Discharge

The thrust of Glick's defense is that Partin was an incompetent employee who would have been fired whether she had

filed her harassment claim or not. Several cases have indicated that employees who are incompetent or have other problems affecting their performance can be terminated without violating Title VII. *See McCluney,* 728 F.2d at 928; *EEOC v. Federal Reserve Bank of Richmond,* 698 F.2d 633, 668–69 (4th Cir.1983), *rev'd sub. nom on other grounds, Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984); *Betts v. Sperry,* 556 F.Supp. 562 (E.D.N.Y.1983); *EEOC v. Murphy Motor Freight Lines,* 488 F.Supp. at 387. Partin's termination letter lists six areas of incompetence, which Altmanshofer placed in the following order of importance: late recertifications and errors in recertification procedures; failure to refile confidential information back into tenant files; accounting errors; errors found in audits of Partin's files; purchase and payment procedures, which meant the failure to forward three bills to accounting; and the untimely submission of reports. The court considers each of these areas in turn.

As was explained in the findings of fact set forth earlier in this memorandum of judgment, recertifications are an important part of Glick paperwork because they are closely tied to Glick's ability to receive money under the federal housing authority programs. Partin had, during the period of May to August, 1983, eleven late recertifications. Altmanshofer testified that this tardiness was unacceptable to Glick, yet the facts also established that at least two other Rental Manager had worse records than Partin. The Rental Manager at Carriage House West, Phase I, in Indianapolis had a total of twenty late recertifications during 1983–1984, while the Manager at Phase III of Carriage House had eighteen during the same two year period. If late recertifications were so unacceptable to

Glick, one would expect that these Rental Managers would be fired. However, they were not, which suggests either that late recertifications are not as important as Altmanshofer suggests, or else that Partin was selected and fired for far fewer transgressions than the Managers at Carriage House West, Phases I and III. Either conclusion works in Partin's favor, because they suggest pretext and disparate treatment of Partin. The first reason offered by Glick is therefore not sufficient to justify Partin's firing.[33]

The second reason offered by Glick was Partin's failure to refile certain confidential documents back into the tenants' files. Altmanshofer indicated that this reason was as important as the late recertifications. The failure to file at issue relates to the discovery by Altmanshofer of a box of documents that Partin had taken to Indianapolis on June 27, 1983 that had not been refiled prior to Partin's vacation in early July, 1983. The box was found on July 12, 1983. Altmanshofer testified that she was "furious" and would have fired Partin on the spot for such gross incompetence. Yet the facts belie this fury and thus the importance of this reason for Partin's termination. Partin returned from vacation on July 18, 1983. No evidence indicates that Altmanshofer told Partin of the problem or her anger. In fact, if Altmanshofer was so upset and would have fired Partin immediately, then one would expect that the firing would have occurred upon Partin's return. The termination did not occur until almost a month later. The only proffered reason for this delay was the fact that Partin had filed a charge, and thus the company was proceeding very carefully. But if failure to refile documents was such gross incompetence, Altmanshofer could have obtained whatever permission was needed to fire

---

**33.** The termination letter also asserts that Partin failed to follow recertification procedures by failing to immediately mail out recertification letters written by Guevara in June, 1983. However, those letters were mailed out no more than ten days after they were written. Given the fact that recertification letters are written ninety days before the recertification is due, it is

hard to see how that short delay could have significantly slowed down the process. The court concludes that these failures are insignificant to Glick as a matter of procedure, but have been included in the termination letter as further pretextual justification for Partin's termination.

Partin from Glick superiors and counsel in the six days between the discovery and Partin's return, or else shortly thereafter. Yet Altmanshofer did not even attempt to obtain approval for Partin's termination at that time; she waited a month to express her supposed fury.[34] The court concludes that this second proferred reasons is unworthy of credence, and that it was pretextual in nature.[35]

The third most important reason offered by Glick for Partin's dismissal are accounting errors made by Partin. The termination letter stated that Partin had a total of eighteen accounting errors, although Altmanshofer testified that Partin received nine memos from accounting detailing seventeen errors during the period of June 22 to August 9, 1983. This was not the worst record for performance in Altmanshofer's region. Marilyn Abel, the Rental Manager at Fairington who replaced Partin at Phase I, had twenty accounting errors from February 7, 1983 to October 7, 1983. If the number of Partin's errors was a real reason for firing her, then Abel should have been fired as well. The fact that Abel was not terminated (and in fact took Partin's place) leads this court to conclude that this reason is pretextual as well.

The fourth reason was Partin's audit record. The termination letter listed four audits in which a total of seventeen files were audited, all of which had errors in them. Glick never established what type of errors were present in the files, when the errors occurred (i.e., whether they were errors made prior to Partin's tenure as Rental Manager, as an audit only reveals the presence of errors in a file, not their origin),[36] or even the significance of the errors. Two of the audits, covering eleven of the seventeen files, occurred in the May-August, 1983 time period, when the effects of the harassment on Partin's job performance began to appear. The court concludes that these errors did not provide a legitimate reason to fire Partin because they were too insignificant in themselves to justify dismissal, and were offered to "pad" the termination letter. The court chooses to disbelieve Glick's explanation of the significance of this rationale for the termination, finding that the reason itself was pretextual.

The fifth reason offered refers to the untimely submission of three bills to accounting. Glick procedure required that bills be submitted to accounting the same or next day, ostensibly to maintain good credit standing. The total of the three bills was approximately $190, and the evidence established that only one was paid with any kind of a late charge. This is hardly the type of tardiness that destroys credit ratings, and it is precisely this insignificance that makes this reason illegitimate on its own to justify Partin's dismissal. The court concludes that this fifth reason for dismissal is pretextual.

The final reason set forth in the termination letter relates to Partin's untimely submission of reports. The report control logs for the period of December, 1982—July, 1983 revealed that Partin submitted a total of seven late Traffic reports, seven late Rental Turnover reports, and one late Inspection report. Similar performance

**34.** A second fact which belies the supposed importance of this particular reason is that Altmanshofer, who was allegedly so furious over the failure to refile, did not put this important fact first or second in the termination letter. In fact, it comes near the bottom of. the second page of the letter, the second to the last area of deficiency noted in the letter.

**35.** Related to this reason was the listing of certain unanswered complaint letters. Short shrift was given to this during closing arguments, and it was generally treated like the unfiled tenant information, for which Altmanshofer was "furious." The same reasoning applies here; the

importance of this reason is overstated precisely because of Altmanshofer's failure to act immediately or soon thereafter. This rationale is also pretextual.

**36.** Glick cannot complain that the time of the error does not matter because Partin, as Rental Manager, was responsible for the contents of the files under her control. In attempts to downplay Marilyn Abel's errors, Glick has argued that some of those errors were due to Partin, the previous Manager, thereby relieving the present Manager of responsibility for them. So, too, should Partin not be responsible for the errors of a predecessor.

records existed for Rental Managers under Altmanshofer's control, including that of Marilyn Abel, who had seven late Traffic and seven late Rental Turnover reports in the same period. However, no one but Partin was fired. If the timely submission of reports was important enough justification to fire Partin, then Altmanshofer should have fired others as well. The fact that she did not do so leads this court to conclude that this sixth and final reason for termination was pretextual.

 Thus, every one of the justifications advanced for Partin's termination in the termination letter are pretextual, and do not offer competent or legitimate reasons to fire Partin. This in and of itself is sufficient to find that Partin's firing was not justified, and under the third step of the *McDonnell-Douglas* paradigm would stand as a sufficient rebuttal of the employer's explanation to justify a finding of a discriminatory termination based upon Partin's filing of her harassment charge.[37] However, the evidence in this case provides further proof for the conclusion that Partin was fired for discriminatory reasons. First, the overwhelming majority of the incidents set out in the termination letter occured after April 1, 1983, with most occurring in June and July, 1983. As noted in the findings of fact, Karen Wagner testified that job performance errors increase when an employee is subject to harassment and management fails to respond or control such harassment. The court found as a matter of fact that Partin's job performance difficulties as set forth in the termination letter were a direct result of the harassment and Glick's failure to respond to that harassment. At least one court interprets the *Henson* and *DeGrace* cases as holding that "an employer cannot use an employee's diminished work performance as a legitimate basis for removal where the dimunition was the direct result of the employer's discriminatory behavior." *Weiss*

*v. United States*, 595 F.Supp. at 1057. *See Lamb v. Smith International, (Drilco Div.)*, 32 E.P.D. ¶ 33,772 (S.D.Tex.1983). Such interpretation makes sense; employers should not be able to make things so miserable for an employee that performance suffers, and then be able to use that which is the employer's fault as a justification for terminating an employee who has complained of the employer's actions. Thus, the reasons listed in the termination letter cannot justify Partin's termination precisely because the overwhelming majority of them are the result of Glick's actions (or failure to act), not Partin's independent deficiencies.

Secondly, the evidence in this case establishes that Altmanshofer did not follow Glick procedure in terminating Partin. At the time of Partin's termination, Glick had a policy entitled "Documenting Unsatisfactory Performance" which required that up to a maximum of three notices be given to an employee as a "necessary step prior to termination of employment." Altmanshofer admitted that she did not give Partin any kind of final notice or any "shape up or you'll be fired" memo prior to termination, although she had given such final notice or probation prior to firing almost all other employees she had fired as Regional Property Manager. She admitted on cross-examination that the reason for this failure to give notice was because Partin had filed the harassment charge, thus evidencing differential treatment because of the charge.

Altmanshofer attempts to justify this failure to notify by claiming that Partin did not need a final notice because she had received previous memoranda about her paperwork. However, the Glick policy requires that the initial notice given to the employee must "indicate specific reasons" for the notice. The memos Altmanshofer refers to are often not specific, and only cover a few of the alleged deficiencies list-

---

37. As the Supreme Court said in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981): "The plaintiff retains the burden of persuasion. He may succeed in this either directly by per-suading the court that a discriminatory reason more likely motivated the employer *or indirectly by showing that the employer's proffered explanation is unworthy of credence"* (emphasis supplied).

ed in the termination letter. Further, the policy on documenting unsatisfactory performance gives a sixty day time period for providing notice. After the initial notice is given, a follow-up notice is to be written "[a] maximum of 30 days after initial notice," and the notice of termination must be written "[a] maximum of 30 days after follow-up notice." Thus, memos written in 1982 and early 1983 cannot be viewed as notice under the policy for purposes of Partin's termination in August, 1983. Thus, the vast majority of memos which Altmanshofer claims gave Partin notice do not do so, at least under the terms of the policy.

Glick also attempts to justify the failure to follow policy by pointing to the last part of the policy, which states: "The above represent maximum time span for action taken. If warranted, the employee should be terminated at an earlier date—immediately, if necessary." Gene Glick testified that the only situation justifying immediate termination was theft, an allegation not present in Partin's case. Given Altmanshofer's past history of giving final notice or probation prior to firing an employee, it appears that this provision of the policy has been used in only two types of situations: theft and Partin's case. The court concludes that Glick cannot rely on this provision to escape the conclusion that its policy on documenting unsatisfactory performance was not properly followed in this case.

■ Third, the court has found as a matter of fact that Glick set out on a course of "building a case" against Partin once the harassment claim was filed. That motive continued to exist even up to the trial, when Altmanshofer presented her biased exhibit in an attempt to show that Partin was the worst Rental Manager in the region. The attempt to build up documentation to justify a dismissal after an employee has filed a charge against the employer can be evidence of retaliation. *See, e.g., Francis v. American Telephone and Telegraph Co.,* 55 F.R.D. 202 (D.D.C. 1972). This is direct evidence of an impermissible retaliatory motive.

Finally, the fact that Partin's termination followed closely on the heels of the Metropolitan Human Relations Commission's finding of probable cause on July 22, 1983, and its subsequent proposed Conciliation Agreement on August 2, 1983, suggest that Partin's termination was a direct retaliatory reaction to the success of Partin's filing of the harassment charge. The genesis of this motive can be seen in Altmanshofer's statement at the 1982 Christmas party, and Jack Kline's statement in his May 16, 1983 memo to Altmanshofer, which both expressed the belief that Partin should simply tolerate Hall and Mickilini's harassment. When the charge was filed, Altmanshofer came to Partin and told her that she was "hurt" because she had been named in the charge, and asked Partin to consider dropping the charge, saying, "I guess we both have to do what we have to do." Altmanshofer's decision that Partin was "unsalvageable" came soon after the filing of the charge, and the decision to decline to have Partin switch places with another rental manager was because Partin had discussed the charge with residents. The unusual meeting of upper management to consider Partin's termination occurred after the fact-finding conference on the harassment charge. These facts amount to overwhelming circumstantial evidence which suggests that Glick fired Partin precisely because of the harassment charge against it.

■ The task assigned to the trier of fact in a retaliation case is to determine which of the party's explanations of the employer's motives it will believe. This court concludes that the evidence in this case overwhelmingly supports Partin's version of Glick's motives, and that Partin's termination would not have occurred but for her filing of the harassment claim against Glick. Therefore, Glick violated Title VII by its retaliatory charge of Partin. Because the same elements apply to retaliation claims under § 1981, *Choudhury v. Polytechnic Institute of New York,* 735 F.2d 38, 43–44 (2d Cir.1984); *Goff v. Conti-*

*nental Oil Co.,* 678 F.2d 593, 598 (5th Cir.1982), Glick violated § 1981 as well.

## STATE LAW CLAIMS

### (A) *Invasion of Privacy*

The Indiana tort of invasion of privacy is defined as follows:

> The unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities, in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibility.

*Continental Optical Co. v. Reed,* 119 Ind. App. 643, 86 N.E.2d 306, 308 (1949). Partin seeks to recover under the "wrongful intrusion into one's private activities" aspect of this tort. While no Indiana case defines the contour of this tort, § 652B of the *Restatement of Torts, Second,* helps to reveal its elements. Comment b to that section states that the tort consists "solely of an intentional interference with the plaintiff's interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man." This suggests two elements to a "wrongful intrusion" claim of invasion of privacy: (1) an interference with or intrusion into one's solitude or seclusion, *see, e.g., Williams v. American Broadcasting Co., Inc.,* 96 F.R.D. 658 (W.D.Ark.1983); (2) that is highly offensive to a reasonable man, *see Berrier v. Beneficial Finance, Inc.,* 234 F.Supp. 204, 205 (N.D.Ind.1964).

Partin points to three intrusions into her privacy: Hall and Mickilini's intrusion into her personal relationship with Moffett through their racially-based harassment; Hall's attempt to eavesdrop on her personal conversations through the use of the intercom found in the rental office kitchen on February 2, 1983; and the removal of personal items from her desk during her July, 1983 vacation. The court considers each of these aspects of Partin's privacy claim in turn.

This court previously held that "the shouting of racial comments, threats of physical harm to the plaintiff and her husband, as well as threats of damage to Mr. Moffett's automobile and other property could certainly constitute intentional interference with plaintiff's personal and private affairs." *Moffett v. Gene B. Glick Co., Inc.,* 604 F.Supp. 229, 236 (N.D.Ind. 1984). Partin's trial brief focuses only on Hall and Mickilini's verbal harassment. While the court reiterates its conclusion that racial comments directed at persons involved in an interracial relationship would be highly offensive to a reasonable man, the issue here is whether the first element above is satisfied. The court has found as a matter of fact that Partin discussed with Glick employees aspects of her personal relationship with Moffett. By discussing that relationship in the office environment, Partin cannot now claim some kind of solitude or seclusion for the relationship in that environment. While the relationship is, in the first instance, a private affair of Partin, she in effect waived her claim to privacy by making what was formerly private a topic of office conversation.

This finding is not inconsistent with this court's conclusion earlier that Partin did not incite or solicit the harassment she received. Glick argues that Partin's discussion of her problems with Moffett invited comments about that relationship, so that the harassment was not unwelcome. However, the court has found that the harassment occurred on a regular, almost daily basis, and was not a response to Partin's comments, but was independently engaged in by Hall and Mickilini out of racial animus towards Moffett and Partin. Further, the exponentially greater amount and severity of harassment compared to Partin's discussions of her personal relationship belie any invitation of the abuse. Hall and Mickilini's verbal abuse was of several orders of magnitude greater than mere response to any discussion Partin may have initiated. Thus, it is disingenuous to suggest that a discussion about

one's marriage or friendship can excuse vicious comments of a racially and sexually derogatory nature. The court here merely concludes that Partin's discussions of her relationship made her private affairs public, thus precluding an invasion of privacy claim for comments made about it. The fact that the comments are harassment is not altered by the public or private nature of the thing commented about.

■ The second intrusion into Partin's private affairs was Hall's placement of the intercom in the kitchen of the rental office on February 2, 1983. The evidence in this case established that the intercom was placed in the kitchen by Hall on February 2 and removed the same day. There was no evidence that any conversations were actually overheard via the intercom. At least two courts have held that, in the absence of an actual overhearing of a private conversation, an invasion of privacy does not occur. *See Vernars v. Young,* 539 F.2d 966, 969 (5th Cir.1976); *Marks v. Bell Telephone Co. of Pa.,* 460 Pa. 73, 331 A.2d 424 (1975). These holdings make sense because the tort requires an intrusion into the plaintiff's private affairs; while Hall's intercom may have made it possible to overhear a conversation, no intrusion would have occurred until something was actually overheard. Without such proof, Partin's second part of her privacy claim must fail as well.

■ The final part of Partin's privacy claim involves the ransacking of her desk and the removal of personal items from the desk while Partin was on vacation. The evidence produced on this point was very scarce. Partin testified that certain personal items including personal correspondence were removed from the desk. However, none of the items or letters were ever described or identified. The only items discussed at trial were a bill for flowers that had been addressed to Cambridge Square, and the envelope containing copies of Partin's harassment charge. The flower bill was addressed to Cambridge Square, and it is hard to see how Glick can be held responsible for opening a letter addressed to one of its complexes. The envelope containing the copies related to a legal matter which involved Glick. As the evidence established that only copies of the charge were inside it, Partin had no real privacy interest in the documents because they had by that time been seen by Glick personnel anyway. In short, Partin has failed to establish any real invasion of any privacy interest arising from the ransacking of her desk.

The court concludes that Partin suffered no invasion of privacy as a result of the actions of Glick or its employees.

(B) *Infliction of Emotional Distress*

■ The general rule of Indiana is that damages for emotional distress are recoverable only when accompanied by and resulting from a physical injury, the so-called "impact rule." *First Federal Savings and Loan Ass'n of Gary v. Stone,* 467 N.E.2d 1226, 1235 (Ind.App.1984); *Little v. Williamson,* 441 N.E.2d 974, 975 (Ind.App. 1982); *Baker v. American States Ins. Co.,* 428 N.E.2d 1342, 1349 (Ind.App.1981). The impact rule applies to claims of intentional and negligent infliction of emotional distress. *Little,* 441 N.E.2d at 975.

■ An exception to the impact rule exists. It arises when there are

certain tort actions involving the invasion of a legal right which by its very nature is likely to provoke an emotional disturbance. False imprisonment and assault actions are examples of instances in which a disagreeable emotional experience would normally be expected to be inextricably intertwined with the nature of the deliberate wrong committed, thereby lending credence to a claim for mental disturbance. The conduct of the defendant in such circumstances is characterized as being willful, callous, or malicious, which may produce a variety of reactions such as fright, shock, humiliation, insult, vexation, inconvenience, worry, or apprehension.

*Charlie Stuart Oldsmobile, Inc. v. Smith,* 171 Ind.App. 315, 326, 357 N.E.2d 247, 253 (1976), *modified on other grounds,* 175 Ind.App. 1, 369 N.E.2d 947 (1977). Thus,

no impact need be shown if (1) there is a tort which invades a legal right of the plaintiff; (2) which is likely to provoke an emotional disturbance or trauma; and (3) the defendant's conduct is willful, callous, or malicious.

Partin argues that Glick is liable under this exception because of three factual situations: the assaults and harassment by Hall and Mickilini; the invasions of privacy; and the wrongful discharge of Partin. The first factual situation identified does not fall under the exception here. The evidence in this case suggests that no assaults actually occurred. Although Hall and Mickilini made statements which suggested threats of physical violence, nothing indicates that those statements were accompanied by overt acts, or that Partin was placed in reasonable apprehension of her safety. *Compare Kline v. Kline*, 158 Ind. 602, 64 N.E. 9 (1902). Nor does harassment in the form of verbal abuse avoid the application of the impact rule. *First Federal Savings*, 467 N.E.2d at 1235. The second factual situation involves invasions of privacy, but the court has already found that no such invasions occurred.

The final factual situation—the wrongful discharge—does meet the *Charlie Stuart Oldsmobile* criteria. As will be discussed below, Glick is liable under Indiana law for wrongfully discharging Partin in retaliation for her filing an harassment charge against Glick. The second and third elements above—likeliness to provoke an emotional disturbance and willful conduct by Glick—are clearly present here. The only issue is whether *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (1973), creates a new tort in light of the fact that its discussion focuses on an exception to the general rule of at will contracts. However, this court believes *Frampton* intended wrongful discharge to be a tort. The court spoke of retaliatory discharge as a "wrongful, unconscionable act" which "should be actionable in a court of law." *Id.*, 297 N.E.2d at 428. This is the language of recognizing an independent tort cause of action, not an exception to a rule of contract law. Thus, an exception to the impact rule applies here, and Glick is therefore liable for intentional infliction of emotional distress for its retaliatory discharge of Partin.

## (C) *Wrongful Discharge*

Indiana law recognizes a cause of action for wrongful discharge. The seminal case was *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (1973), where the Indiana Supreme Court held that a discharge of an at will employee in retaliation for filing a workman's compensation claim was actionable:

> Retaliatory discharge for filing a worker's compensation claim is a wrongful, unconscionable act and should be actionable in a court of law ... Under ordinary circumstances, an employee at will may be discharged without cause. However, when an employee is discharged solely for exercising a statutorily conferred right an exception to the general rule must be recognized.

297 N.E.2d at 428. Subsequent cases have sharpened the meaning of this broad language. While the *Frampton* court spoke in terms of the public policy behind the workman's compensation statutes, it referred to a specific prohibition in those statutes prohibiting the use of any "device" to relieve an employer of its obligations under the statutes. Subsequent courts have taken this to mean that an attempt to declare any discharge unlawful by reference to some general public policy is insufficient under the *Frampton* rationale. *Rice v. Grant County Bd. of Commissioners*, 472 N.E.2d 213, 215 (Ind.App. 1984); *Campbell v. Eli Lilly & Co.*, 413 N.E.2d 1054 (Ind.App.1980); *Martin v. Platt*, 179 Ind.App. 688, 386 N.E.2d 1026 (Ind.App.1979). A cause of action under the *Frampton* rule "must allege the discharge of an employee at will was in retaliation either for fulfilling a statutorily imposed duty or exercising a statutorily conferred personal right." *Rice*, 472 N.E.2d at 215; *Campbell*, 413 N.E.2d at 1061.

Glick's argument is based almost exclusively on the "statutorily imposed duty" half of this formulation, arguing that Partin had no duty to file a discrimination charge against Glick, so that the *Frampton* rule did not apply. The court disagrees with Glick's conclusion. The interpretation of *Frampton* set forth in *Rice* also recognizes that *Frampton* applies if the plaintiff was exercising a statutorily conferred personal right. Partin clearly had a personal right to file a harassment claim under 42 U.S.C. § 2000e–5 when Glick violated Title VII by acquiescence in Hall and Mickilini's harassment of Partin. As this court held earlier, Partin's discharge was a result of Glick's retaliation for Partin's exercise of her right to file a harassment charge. The *Frampton* rule clearly applies here, and Glick wrongfully discharged Partin under that rule. Therefore, Partin is entitled to recover under her wrongful discharge claim.

### DAMAGES

Partin seeks lost wages, compensatory damages for emotional distress, and punitive damages, as well as costs and attorney fees. Lost wages are recoverable under all three theories on which Partin prevailed. *See Albermarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) (Title VII); *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975) (§ 1981); *Perry v. Hartz Mountain Corp.*, 537 F.Supp. 1387, 1389 (S.D.Ind.1982) (wrongful discharge). Partin established that she had lost wages, after deducting the unemployment compensation she received, of $10,895.00.

Title 28, United States Code, § 1961, provides for an award of interest on a money judgment whenever the law of the state in which the court sits permits such an award. Although § 1961 explicitly refers only to post-judgment interest, the Seventh Circuit has held that this statutory reference is not intended to affect a plaintiff's entitlement to prejudgment interest under state law. *Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591, 607 (7th Cir.1985). *See also In re Air Crash Disaster Near Chicago, Illinois*, 480 F.Supp. 1280, 1282 (N.D.Ill.1979), *aff'd*, 644 F.2d 633 (7th Cir.1981).

Indiana law recognizes that amounts which are due and are specific, liquidated in amount, or subject to calculation allow for the assessment of prejudgment interest. *Public Service Co. of Ind., Inc. v. Bath Irons Works Corp.*, 773 F.2d 783 at 765–7 (7th Cir.1985); *Price v. Amoco Oil Co.*, 524 F.Supp. 364, 372 (S.D.Ind. 1981); *Courtesy Enterprises, Inc. v. Richards Laboratories*, 457 N.E.2d 572, 580 (Ind.App.1983); *Abex Corp. v. Vehling*, 443 N.E.2d 1248, 1260 (Ind.App.1983). The rationale behind this rule is that the plaintiff has lost the use of the money during the period of time needed to vindicate her rights; prejudgment interest therefore serves as additional damages which achieve full compensation of the plaintiff. *See Argonaut Ins. Co. v. Town of Cloverdale, Ind.*, 699 F.2d 417, 421 (7th Cir.1983); *Indiana Ins. Co. v. Sentry Ins. Co.*, 437 N.E.2d 1381 (Ind.App.1982).

Prejudgment interest is computed from the time the principal amount was demanded or due. *Abex Corp. v. Vehling*, 443 N.E.2d at 1260; *Indiana Tel. Corp. v. Indiana Bell Tel. Co.*, 171 Ind. App. 616, 358 N.E.2d 219, 229 (1976). The rate of prejudgment interest is set by statute, *see Matter of Estate of Kingseed*, 413 N.E.2d 917, 935 (Ind.App.1981); I.C. 24–4.-6–1–102 allows for a rate of eight percent (8%). Utilizing the figures set out in plaintiff's Exhibit 63, which the court accepts but for the interest rate contained therein, and recalculating with an eight (as opposed to twelve) percent interest rate, the court determines that Partin is entitled to $757.02 in prejudgment interest up to the date of trial, and $518.22 in interest up to October 21, 1985, at a per diem rate of $2.39. The total prejudgment interest as of October 21, 1985 is $1,275.24, so that Partin is entitled to recover $12,170.24 as lost wages.

Compensatory damages to cover the emotional distress suffered by Partin and the costs of relieving that distress are recoverable under § 1981, *see Johnson*, 421 U.S. at 460, 95 S.Ct. at 1720, the intentional infliction of emotional distress claim, and the wrongful discharge claim, *see Perry*, 530 F.Supp. at 1389. Dr. Titchener testified that Partin would need therapy for two years, and the total cost of that therapy, based on his estimates of hourly rates, would be $16,640.00. Partin is therefore entitled to recover $16,640.00 as part of the compensation for her emotional distress suffered as a result of Glick's actions in this case.

A subsidiary issue is the amount of compensation for Partin's emotional distress itself. The determination of a dollar amount for emotional trauma is necessarily very difficult because it involves factors for which no logical assignment of monetary value can be made. The court approaches this issue from the perspective that the trauma suffered by Partin is such that, according to Dr. Titchener, it can be overcome with two years of therapy. Given that the trauma began in late 1982 when the harassment reached a level of daily regularity, and projecting out to the putative date of "cure" two years hence, what Partin seeks is compensation for trauma lasting approximately five years in length. Partin testified that in November, 1984, slightly more than one year after her termination, she took a job as an office manager at a Mercedes dealership in Houston, Texas, and is apparently able to function adequately within that job. However, it is also clear that Partin suffered a significant amount of emotional distress. She suffered loss of appetite and sleeping problems as early as December, 1982. She suffered through a stormy home life as a direct result of the harassment, and felt anxiety, helplessness, and fear. As late as January, 1985, when Dr. Titchener examined her, Partin suffered from anxiety. The court concludes that an award of $50,000.00 would adequately compensate Partin for her emotional distress suffered as a

result of Hall and Mickilini's harassment and Glick's retaliatory discharge.

The Seventh Circuit's most recent discussion of emotional distress damages, *Ramsey v. American Air Filter Co., Inc.*, 772 F.2d 1303, 1313–14 (7th Cir.1985), supports this determination. In *Ramsey*, the Seventh Circuit reduced a $75,000.00 award to $35,000.00 because of a "paucity of references to any emotional harm that plaintiff suffered as a result of defendant's discrimination," at 1313. Here, the record is replete with evidence of the emotional harm Partin suffered. Dr. Titchener testified of intrusive imagery and anxiety, and defendant's expert Dr. Levitt spoke of a "malignant emotional outcome" from prolonged harassment. Both of these experts testified of a need for prolonged psychotherapy to rid a person like Partin of the symptoms this court has found she suffered and continues to suffer from. Glick, in attempting to put all of the blame on Moffett, unwittingly bolstered the evidence of the serious emotional harm and humiliation suffered by Partin. This record amply demonstrates that $50,000.00 is not an excessive award for Partin's emotional distress.

The award of punitive damages in civil rights cases is governed by federal law. *Lenard v. Argento*, 699 F.2d 874, 890 (7th Cir.1983). Punitive damages may be assessed under § 1981. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). Under 42 U.S.C. § 1983, a companion statute to § 1981, punitive damages may be assessed when the defendant's conduct "is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). Equally important, however, is the fact that punitive damages are designed to punish the defendant for its outrageous conduct and to deter it and others from engaging in similar conduct. *Ramsey*, at 1314; *Lenard*, 699 F.2d at 890. A jury (or other fact-finder) must make a discretionary moral judgment that the poli-

cies of punishment and deterrence would be served by an award of punitive damages. *Smith,* 103 S.Ct. at 1638–39; *McKinley v. Trattles,* 732 F.2d 1320, 1326 (7th Cir.1984). As the Seventh Circuit stated in *Lenard,* "Damages should not go beyond deterrence and become a windfall." 699 F.2d at 890. *See also Ramsey,* at 1314.

Under Indiana law, a similar policy concern for punishment and deterrence exists: "Punitive damages are not intended to compensate a plaintiff but rather are intended to punish a wrongdoer and thereby deter others from engaging in similar conduct in the future." *Husted v. McCloud,* 450 N.E.2d 491, 495 (Ind.1983); *Travelers Indemnity Co. v. Armstrong,* 442 N.E.2d 349, 362 (Ind.1982). Thus, plaintiffs have no entitlement to punitive damages, and are held to a higher standard of proof. *Travelers Indemnity,* 442 N.E.2d at 362.

■ This case is an excellent example of the "outrageous conduct" which the *Ramsey* court stated can support an award of punitive damages. The record makes clear that as early as December, 1982, Glick management tolerated and implicitly condoned the regular harassment of Partin by Hall and Mickilini. Altmanshofer, fully aware of the extent of the harassment, avoided her responsibility to stop the harassment, in part because she condoned it. When Partin rightly filed her harassment charge, Glick set out to build a case against Partin so as to have a facially valid (albeit substantively flimsy) rationale to fire her in retaliation for the charge. The tolerant attitude, the lack of meaningful managerial response which no doubt sprang from it, and the attempts throughout this case to lay the blame at Partin's feet when the evidence clearly established Glick's culpability, have no place in a society dedicated to the principles embodied in Title VII and § 1981. Glick must be punished for its actions in this case, and other employers must be clearly warned that the outrageous and willful conduct present in this case will not be tolerated by the federal courts. Therefore, the court finds that a punitive damage award of $15,000.00 is appropriate in this case.

Thus, the total amount of damages which will make Partin whole is $78,810.24, plus punitive damages of $15,000.00. Glick has raised a final issue concerning damages: the effect, if any, of the settlement between Partin and Hall and Mickilini. Glick did not attempt to put any of the details of the settlement into the record; only through passing references in the final argument was a record made on the size of the settlement, which was for $50,000.00.[38] Glick seeks a credit against the judgment here in the amount of the settlement.

■ The Seventh Circuit has held that Title VII's remedial purpose is to make a plaintiff "whole" for injuries suffered on account of unlawful discrimination. *Freedman v. Air Line Stewards & Stewardesses,* 730 F.2d 509, 513 (7th Cir.1984); *Kamberos v. GTE Automatic Electric, Inc.,* 603 F.2d 598, 602 (7th Cir.1979). The concept behind this and any other compensatory remedy is to compensate the plaintiff for what she lost, be it wages or emotional and mental calm. When as here a court determines the amount of damages which will make a plaintiff whole, the plaintiff is entitled to receive only that amount—anything more constitutes a windfall which is not contemplated in the purpose of the remedy. Therefore, Partin is entitled to recover *in toto* that amount of damages which will make her whole.

■ The actual damages established in this case support the conclusion that a set-off is proper here. Partin established her lost wages, which uniquely flow from her wrongful termination, and a single emotional harm. No attempt was made to

**38.** Technically, the size of the settlement has never been placed into evidence; references in final argument are not competent evidence in the course of a trial. Yet there is no dispute that the size of the settlement was $50,000.00, and that amount was discussed by both parties with the court in chambers early in the trial. The court will therefore assume that this figure is accurate for purposes of its analysis.

show how that emotional harm was distinctly caused by Hall and Mickilini or by Glick. Both the harassment and termination were stressful, but the emotional injury arising from those actions is simply indivisible on this record. The Seventh Circuit has very recently stated in a case brought under § 1983:

It is axiomatic that where several independent actors concurrently or consecutively produce a single, indivisible injury, each actor will be held jointly and severally liable for the entire injury. *Restatement (Second) of Torts,* §§ 875, 879; *Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 260 & n. 8 (1979) ... the very nature of damages as compensation for injury suffered requires that once the plaintiff has been fully compensated for his injuries by one or more tortfeasors, he may not thereafter recover any additional compensation from any of the remaining tortfeasors. *See Restatement (Second) of Torts,* § 885(3) and comment e, § 886 and comment a. *See also Dundee Cement Co. v. Howard Pipe and Concrete Products, Inc.,* 722 F.2d 1319, 1324 (7th Cir.1983); *Whitehurst v. Charles Town Hospital,* 626 F.2d 357 (4th Cir.1980).

*Watts v. Laurent,* 774 F.2d 168 at 179 (7th Cir.1985). A partial compensation for indivisible injuries must function in the same way. Thus, the court has held that $66,640.00 would make Partin whole for the emotional harm she suffered as a result of the harassment and termination. By entering into a settlement with Hall and Mickilini, Partin received $50,000.00 for that harm. That money clearly goes towards making her whole for her emotional distress, and there is no justification for ignoring the sum received in settlement in determining what Glick must pay to complete the process of making Partin whole.

■ Indiana law, which both parties cite, supports Glick's position. In *Bedwell v. DeBolt,* 221 Ind. 600, 50 N.E.2d 875, 879 (1943), the Indiana Supreme Court stated:

"... a covenant not to sue one joint tortfeasor does not bar an action against the others, but operates as a satisfaction of the damages, *pro tanto,* as to the benefits received." While the relationship between employer and employee under principles of respondeat superior is not that of joint tort-feasors, it does fall within the rule set forth in *Bedwell. Henry B. Steeg and Associates, Inc. v. Rynearson,* 143 Ind. App. 567, 241 N.E.2d 888, 890 (1968).

Partin argues that such set-offs must be pleaded, and that Glick failed to make any attempt to amend the Pre-Trial Order to include this issue. While it is true that Glick was derelict, Partin cannot claim any real prejudice—she was a party to the agreement and certainly knew its details. Partin also claims that the *Bedwell* rule does not apply in the respondeat superior situation, but the language of *Steeg* refutes that argument. Thirdly, Partin points to the incongruity of Glick arguing that Hall and Mickilini were not its employees for purposes of the state law tort claims but are its employees for a set-off. However, Glick is not being inconsistent. It argues that respondeat superior does not apply for purposes of the state law torts, but if the court should find it liable under respondeat superior, then it is entitled to a set-off. It can certainly argue in the alternative. Lastly, Partin argues that Glick cannot claim the benefits of a settlement between Partin and Hall and Mickilini as to those acts (such as the retaliatory discharge) of which Glick alone is liable. But the only injury which can be uniquely attributed to Glick is the lost wages incurred as a result of the retaliatory termination. The emotional injury, as noted above, is simply indivisible. With no way to apportion the emotional distress damages, the liability of Glick, Hall and Mickilini is such that a partial compensation by one defendant entitles all other defendants to a "credit" or "set-off" in the amount of that compensation. Glick is therefore entitled to apply the $50,000.00 settlement to the emotional distress damages, so that Glick is liable for

**290**

$28,810.24 in compensatory and $15,000.00 in punitive damages.

▮ Partin is also entitled to her reasonable attorney fees, 42 U.S.C. § 2000e–5(k); 42 U.S.C. § 1988, and her reasonable costs. 28 U.S.C. § 1920. Partin has not submitted a request for fees detailing the amount her attorneys seek under these provisions, and thus the court cannot enter an order setting forth the amount of the award. Plaintiff will be ordered to submit a motion to the court within twenty (20) days from the date of this order setting forth detailed information justifying her request for fees.

This Memorandum of Decision contains the court's Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure. *See Rucker v. Higher Educational Aids Board,* 669 F.2d 1179, 1183–84 (7th Cir. 1982).

### CONCLUSION

Plaintiff has established by a preponderance of the evidence that violations of Title VII, of 42 U.S.C. § 1981, and of the Indiana law concerning the intentional infliction of emotional distress and wrongful discharge have occurred. Plaintiff is therefore entitled to relief.

To remedy these violations, the court ORDERS the following: Plaintiff Partin is entitled to $78,810.24 in compensatory and $15,000.00 in punitive damages. Defendant Glick is entitled to a credit of $50,-000.00 because of the settlement between Partin and Hall and Mickilini. Therefore, defendant Glick is hereby ORDERED to pay plaintiff Partin $28,810.24 as its share of lost wages and compensatory damages, and $15,000.00 as punitive damages, for these violations. Glick is also hereby ORDERED to pay Partin's costs and reasonable attorney fees in an amount to be determined in a subsequent order of this court. Partin is hereby ORDERED to file within twenty (20) days of the date of this order her motion for fees and costs.